FILED
IN OPEN COURT

AUG 17 2017

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 1:17-CR-122-AJT |
| ) | |
| KIRK RUSSEL MARSH, ) | |
| ) | |
| Defendant. ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations in the Criminal Information and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt:

1. Defendant KIRK RUSSEL MARSH ("MARSH") lived in the Eastern District of Virginia. From August 2009 through November 2012, MARSH worked for Virginia Commerce Bank ("VCB") as a Vice President for Government Contract Lending in the Chantilly, Virginia Office, which is located in the Eastern District of Virginia.

2. At VCB, MARSH was primarily responsible for issuing commercial loans to local businesses that had contracts with the U.S. government.

3. In January 2014, VCB was acquired by United Bank, which continued to operate VCB's branches under the United Bank name.

4. From November 2012 through September 2015, MARSH worked for Fulton Bank in Herndon, Virginia, which is located in the Eastern District of Virginia. At Fulton Bank, MARSH was primarily responsible for issuing commercial loans to local businesses that

1

had contracts with the U.S. government. Fulton Bank is a subsidiary of Fulton Financial Corporation.

5. At all times relevant, VCB, United Bank and Fulton Financial Corporation were financial institutions within the meaning of 18 U.S.C. § 20, whose deposits were insured by the Federal Deposit Insurance Corporation ("FDIC").

6. On December 12, 2008, VCB received a $71 million investment from the U.S. Treasury under the Capital Purchase Program ("CPP"), a subset of the Trouble Asset Relief Program ("TARP"), a taxpayer-funded program. On December 23, 2008, Fulton Financial Corporation received a $376.5 million investment from the U.S. Treasury in the form of TARP CPP funds.

7. Wave Software, which operated under various trade names, was incorporated by PF in the Commonwealth of Virginia.

8. As an employee of VCB and later Fulton Bank, MARSH signed employment agreements and agreed to abide by a code of conduct. As MARSH well knew, officers of VCB and Fulton Bank were supposed to avoid conflicts of interest and the appearance of conflicts of interest, which included: occupying or assuming a fiduciary role for a client or customer; investing in a business that was a client of the bank; or engaging in outside employment without prior approval of the bank.

9. As an officer of VCB and later at Fulton Bank, MARSH was responsible for reviewing applications for loans and lines of credit, and making recommendations to his superiors as to whether to approve or deny applications. MARSH's supervisors, particularly

officers who had final approval authority, used and relied on MARSH's analysis and recommendations.

10. Depending upon the amount of the loan or line of credit requested by the customer, MARSH had authority to act on behalf VCB or Fulton Bank. MARSH also had authority to authorize draws on lines of credit.

11. MARSH was also responsible for managing and overseeing existing loans, which included conducting periodic reviews and assuring that the loans were being used for their stated purpose. As an officer of VCB and Fulton Bank, MARSH was supposed to safeguard the money, property and assets of these financial institutions.

12. At both VCB and Fulton Bank, MARSH used his official position and authority to recommend and cause the approval of loans and lines of credit that did not meet the lending criteria for the financial institution, as MARSH well knew at the time. In at least one instance, VCB had previously denied the same applicant a loan.

13. To further the scheme and artifice to defraud, and to obtain money and property under the custody and control of VCB and Fulton Bank, MARSH and others created and/or caused the submission of false and fraudulent documents; made or caused the making of false entries in the records, books and reports of VCB and Fulton Bank; falsified, forged and caused the falsification or forging of signatures of other, real persons, including bank officers and borrowers.

14. MARSH forged these signatures because, as he well knew, the signatures were necessary for approval and issuance of the loan. As a result of forging the signatures of various bank officers, MARSH also circumvented internal controls and review of these loans and

lines of credit, which might otherwise have led to additional scrutiny and/or denial of the applications.

15. Among the materials included with a loan application for company CC was a false and fraudulent personal financial statement. This fraudulent financial statement made the financial condition of the borrower appear better than it truly was. As MARSH well knew, a financial statement was one factor that VCB considered in determining whether to approve such a loan.

16. In reviewing applications, as well as in managing existing loans, MARSH knowingly and intentionally permitted borrowers to use loans and lines of credits for unauthorized purposes, such as to pay personal expenses with a working capital loan purportedly authorized for a business.

17. To cause the approval of some loan applications while at VCB, MARSH forged the signatures of other bank officers, including some of his supervisors. These signatures were necessary for the loans to be approved and funded. As MARSH well knew at the time he forged the signatures, he was using the names and PII of other, real persons without their knowledge or consent. MARSH also knew that these signatures, which signified that the loans had been reviewed, were material to the decision of whether to approve and fund the loan. MARSH forged the signatures of other officers at VCB intentionally, in order to induce VCB to approve the loan. As MARSH well knew, if VCB had known that the signatures were forged, the loans would not have been approved. These loans were funded by VCB, which put VCB at risk of loss for the amount of the loan shown in the table below.

18. The following table includes loans that were part of the scheme to defraud VCB:

| Loan # | Borrower | Forged Items | Identities Used | Loan Amount |
|---|---|---|---|---|
| x7272 | MTS | Signatures of bank officers | L.R. and D.B. | $150,000 |
| x7248 | CIQ | Signatures of bank officers | T.E. | $100,000 |
| x6837 | SG | Signatures of bank officers | P.C. and D.B. | $100,000 |
| x6683 | Company S | Signatures of bank officers | L.R. and D.B. | $250,000 |
| x7337 | FHS | Signatures of bank officers | T.E. | $100,000 |
| x7167 | FHS | Signatures of bank officers | L.R. and D.B. | $50,000 |
| x7418 | Company V | Signatures of bank officers | J.S. | $250,000 |
| x4606 | TJW | Signatures of bank officers | L.R. and D.B. | $150,000 |
| x7175 | CC | Personal financial statement |  | $100,000 |
| Total |  |  |  | $1,250,000 |

19. CC had defaulted on its $100,000 loan, which caused an actual loss to VCB of $95,385.73. The other loans shown in the table above are not in default and VCB has not incurred a loss.

20. L.R, D.B., T.E., P.C. and J.S. are all real persons who were officers of VCB. L.R. was an Executive Vice President. D.B. was a Senior Credit Officer. J.S. was a Senior Vice President and P.C. was the CEO.

21. MARSH used his access to and knowledge of VCB's operations, as well as his position within VCB, to perpetrate, further, and carry out the scheme.

22. While at VCB, PF became a client of Marsh. In his capacity as a VCB employee, MARSH approved PF's application for a $500,000 term loan and $250,000 line of credit on behalf of Wave Software. Less than six months later, MARSH gave a personal loan to PF, which was deposited into a VCB account in the name of 360 Data, a business then owned and controlled by PF, who was still a client of MARSH. At no time did MARSH disclose to VCB or his supervisors that he had given a personal loan to PF, which was in violation of VCB's policy that employees should not represent the bank in any transaction in which the employee has any material connection or substantial financial interest. VCB would not have allowed MARSH to continue as the loan officer for Wave Software if it had known of this relationship.

23. Beginning in 2013 and continuing through 2014, MARSH caused the creation of false and fraudulent documents to induce Fulton Bank to approve a $5 million line of credit for SGI, whose accounts were previously overseen by MARSH when he was employed at VCB. The representatives of SGI including J.M, M.B. and H.W., who were all real persons. J.M. and other representatives of SGI repeatedly told MARSH that they did not want SH, a separate company, or ESR, a joint venture with a foreign partner, to be guarantors, grantors or borrowers on the line of credit. The ability to satisfy this request was material to SGI's decision to obtain a line of credit with Fulton Bank. To cause approval of the line of credit, MARSH caused the creation of false and fraudulent documents, including a letter with the forged signatures of J.M, M.B. and H.W., as well as documents on which ESR was listed on the loan and SH was listed as a guarantor. The commercial guaranty for the loan included a forged signature of M.B. The forged

documents were material to Fulton Bank's decision to authorize the $5 million line of credit, which put Fulton Bank at risk of loss for that amount.

24. In 2014, MARSH caused the approval of a $1 million dollar line of credit ("LOC") by using his position as a bank officer of Fulton Bank. The application used AF's name and PII, including Social Security number, without her knowledge or consent.

25. The application for the $1 million LOC falsely stated that the $1 million dollars was for operating capital for Wave Software when, as MARSH well knew, it was to finance the sale of Wave Software from PF to a holding company named Wave Software Holdings, which MARSH controlled. MARSH was the loan officer on the $1 million line of credit, which he used to personally benefit himself by purchasing Wave Software through a shell company. For example, a draw of $583,000 on this line of credit was used to pay off existing credit lines for Wave Software at VCB. An additional $350,000 was electronically transferred to a Wave Software account at VCB on which PF was a signatory.

26. As part of the agreement associated with this transaction, MARSH assumed the title of Chief Executive Officer ("CEO") for Wave Software. At the time he submitted the paperwork for the $1 million line of credit for approval at Fulton Bank, MARSH did not disclose his prior relationship with PF, nor did he disclose the benefits that he was going to personally receive if the line of credit was approved. As MARSH well knew, participating in the transaction as the loan officer violated Fulton Bank's policies and gave rise to a conflict of interest. MARSH intended to and did personally benefit from the transaction, as he well knew at the time he recommended its approval to his supervisors

at Fulton Bank. At no time did MARSH disclose his true relationship with PF or Wave Software to Fulton Bank.

27. As part of the purchase of Wave Software, PF was promised a total of $1.8 million. To date, MARSH still owes $800,000, plus interest, to PF. In negotiations to purchase Wave Software, MARSH used the alias "Mark Smith," who he claimed was a former client and the actual buyer. PF did not know that MARSH was the true beneficiary of the deal.

28. In 2014, MARSH caused the approval of a $125,000 business line of credit for a real person, XS, by Fulton Bank. As MARSH well knew at the time, XS intended to and did use the line of credit for personal expenses, including his children's private school tuition. While MARSH was still the loan officer for this line of credit, MARSH recruited and hired XS to work for Wave Software. At the time, MARSH was CEO for Wave Software. Even after XS became his employee, MARSH continued to be the loan officer for XS's line of credit.

29. In mid-2015, MARSH asked XS to authorize a $40,000 draw on XS's line of credit with Fulton Bank so that the money could be used to cover Wave Software's payroll. As MARSH well knew at the time, this was not an authorized use of the line of credit and violated Fulton Bank's conflict of interest policies. XS agreed to authorize the draw, after which the funds were used by Wave Software.

30. Later in 2015, MARSH recommended that XS increase XS's line of credit with Fulton Bank. After XS agreed, MARSH caused the submission of paperwork and recommended its approval, which resulted in XS's line of credit being raised to $485,000.

    At the time, MARSH knew that XS's line of credit was not being used for the stated purpose of the loan, but rather was being used primarily to cover XS's personal expenses.

31. After XS's credit line was increased to $485,000, MARSH caused some unauthorized draws to be made on XS's credit line. Some of the funds from these draws went to accounts owned or controlled by MARSH, including accounts in the name of Wave Software. For example, MARSH used over $120,000 of these funds to repay a personal loan that he had made to Wave Software in order to make the down payment on MARSH's personal residence. MARSH made false and fraudulent statements regarding the source of the down payment to First Home Mortgage, which financed the purchase of MARSH's personal residence with a loan of more than $600,000.

32. As MARSH well knew, some of the draws that MARSH authorized on XS's LOC were for unauthorized purposes, including to pay Wave Software operating expenses.

33. At no time did MARSH disclose his outside employer-employee or lender-borrower relationship with XS to Fulton Bank, although MARSH well knew that it created a conflict of interest and could have affected approval of XS's line of credit, and whether MARSH could serve as the loan officer for XS.

34. The following table shows the lines of credit that MARSH and other members of the scheme fraudulently induced Fulton Bank to approve. The $1 million line of credit in the name of Wave Software is currently in default, while the line of credit in XS's name has a balance of at least $437,000.

| Loan # | Borrower | Loan Amount | Current balance | Identities Used |
|---|---|---|---|---|
| x0623 | Wave Software | $1,000,000 | $1,049,639.57 | AF |
| x1818 | XS | $485,000 | $437,143.71 | XS |
| x5333 | SGI | $5,000,000 | current | ESR, SH, M.S., J.M., H.W. |

35. After purchasing Wave Software, MARSH solicited funds to purportedly assist with the operations of the company from various sources. In these negotiations, MARSH did not disclose the means by which he fraudulently obtained the company, and held himself out as the bona fide owner. He also did not disclose the extent of the debt still owed to PF. Headway Capital and On Deck are two companies that agreed to give funding to MARSH, based on his false and fraudulent representations. Headway Capital provided $35,000; MARSH owes over $25,000.

36. In August 2015, MARSH agreed to participate in a voluntary interview with Special Agents with the Special Inspector General for Trouble Asset Relief Program ("SIGTARP"). MARSH agreed to cooperate with the government. As part of that cooperation, MARSH met with the government in September and October 2015 pursuant to proffer agreements.

37. Beginning in 2016, MARSH fell behind in paying various expenses associated with Wave Software, including employee salaries. As a result, all Wave Software employees had stopped working by the end of 2016. By 2017, Wave Software had no employees and MARSH did not have the ability to renew existing clients or service new clients, because he lacked the technical capability and know-how to create new license keys for the software.

38. Mazuma Capital and Tetra Financial were companies based in Utah that provide funding and leasing agreements for companies seeking to buy or obtain equipment.

39. Rapid Advance was a financial services company based in Maryland that provides working capital to small and midsized businesses.

40. Payroll Funding Corporation was a financial services company based in New Jersey that provides working capital and loans to companies.

41. Taycor Financial and Tiger Finance were private financial services companies that provide loans, leasing and other equipment leasing. Taycor Financial was based in California.

42. One Way Funding and Strategic Funding were private financial services companies based in New York that provide working capital and loans to small businesses.

43. Harbour Capital was a broker that helps businesses obtain working capital and equipment financing. It was based in Concord, New Hampshire.

44. Marsh Associated Services was a company based in Virginia, which was started by SM and KM, the defendant's parents. It was originally a real estate appraisal service, but has engaged in no real business activity for at least the last two years and has no assets or substantial income.

45. Revive You Media was a company based in California that sells cosmetics and health products. In August 2016, MARSH approached the true owner of Revive You Media and stated he was interested in purchasing the company. In or about October 2016, MARSH entered into an agreement to purportedly purchase Revive You Media for a sales price of over $5 million, which included over $2 million in cash reserves. As

MARSH well knew, he did not have any financing or liquid capital at that time to complete the sale, with which to close the deal. MARSH also did not disclose that he was in substantial debt, and owed over $800,000 to PF, the true owner of Wave Software.

46. As part of purported due diligence in purchasing the Revive You Media, MARSH requested and obtained financial information and statements from the owner and employees of Revive You Media beginning in 2016 and continuing through 2017.

47. Act-On was a company that provides marketing automation software that helped companies coordinate online marketing campaigns.

48. Technologists Inc. and Venesco were real companies that were previously clients of MARSH when he worked as a bank officer at VCB. Both were based in the Eastern District of Virginia. As a loan officer for these companies, MARSH had access to information about the companies and their officers.

49. Advantage Leasing was a financial services company based in Wisconsin that provides equipment lease financing.

50. Beginning on a date unknown, but by at least 2016 until his arrest in July 2017, MARSH attempted to fraudulently secure money, financing and other items of value from various financial institutions and private companies through false and fraudulent pretenses. These efforts included the following:

   a. In or about August 2016, shortly after MARSH contacted Revive You Media, MARSH began fraudulently holding himself out as an owner and officer of the company. MARSH used real financial information for Revive You Media in order to obtain services from Act-On Software. Based on false and fraudulent representations

about his ownership of Revive You Media, Act-On provided $96,000 in services. These services were contracted for without the knowledge or consent of Revive You Media.

b. In or about May 2016, MARSH submitted a fraudulent application seeking $2.5 million in financing from Tetra Financial, for a purported deal between Technologists, Inc. and Wave Software. As MARSH well knew, he would have been the beneficiary of the $2.5 million if the deal had funded, because the money was for the purported purchase of software from Wave Software. During the application process, MARSH used the name and PII of ET, a real person and the Chief Financial Officer ("CFO") of Technologists, Inc. MARSH also forged the signature of ET on documents provided to Tetra Financial.

c. In or about January 2017, MARSH obtained $350,000 in financing from Strategic Funding Source by fraudulently holding himself out as the owner of Revive You media and selling the company's receivables. To secure this financing, MARSH provided real financial information that he had obtained from Revive You Media during his purported negotiations to purchase the company. At no time did MARSH have authorization to negotiate on behalf of Revive You Media or sell its receivables.

d. In or about March 2017, MARSH attempted to obtain $100,000 from Advantage Leasing in the name of Revive You Media.

e. In April 2017, MARSH attempted to obtain $97,500 in financing from Tiger Finance and $35,000 in financing from Taycor Financial using the identities of two other real companies, Marsh Associated Services and Venesco. To communicate with Tiger

Finance, MARSH purchased two fraudulent domain names, venescosoftware.com and marshadvisoryservices.com, and used an alias, Ronaldo Gomes. MARSH held Ronaldo Gomes out as a Venesco employee, and sent fraudulent communications using a fraudulently created email account in the name of Ronaldo Gomes @venescosoftware.com to communicate with Tiger Finance and Taycor Financial. In negotiating on behalf of Marsh Associated Services, MARSH fraudulently held himself out as KM, his father. He also used the name and PII of his mother, SM, including her social security number, on financing applications. MARSH also forged SM's signature on these applications.

f. From 2016 through April 2017, MARSH again solicited financing from Tetra Financial. This time, MARSH requested $3 million for a purported deal between Revive You Media and Wave Software. As MARSH well knew, he would have been the beneficiary of the $3 million if the deal had funded, because the money was for the purported purchase of software from Wave Software. As part of the fraudulent application process, MARSH provided documents that he had fraudulently obtained from Revive You Media during the purported due diligence process, and forged the signature of the true owner of Revive You Media, CH, on documents provided to Tetra Financial. To communicate with Tetra Financial, MARSH purchased a fraudulent domain name, reviveyoumedia.biz and used an alias, Ronaldo Gomez, who purported to work for Revive You Media. MARSH also created a fraudulent email account in the name of Ronaldo Gomez in order to communicate Tetra Financial.

14

g. In or about March 2017, MARSH solicited $100,000 in financing from Advantage Leasing by fraudulently holding himself out as the owner of Revive You Media.

h. In or about April 2017, MARSH solicited One Way Funding for financing and was approved for $500,000 by a company called Lendr and $160,000 by Everest Business Funding. In these negotiations, MARSH fraudulently held himself out as the owner of Revive You Media and sent him real financial records for the company; MARSH did not disclose that he had previously obtained other financing, which was material to One Way Funding. The approved funds were never disbursed because One Way Funding became aware that MARSH had already obtained funding from Strategic Funding and was in default.

i. In or about April 2017, MARSH solicited $25,000 in funding from Harbour Capital, a broker that helped businesses find private financing, by holding himself out as the owner of Revive You Media.

j. In or about May 2017, MARSH entered into a contract with Rapid Advance to sell $169,000 of Revive You Media's receivables in exchange for $120,000 in financing. In this paperwork, MARSH falsely held himself out as the owner of Revive You Media.

k. In or about June 2017, MARSH solicited $150,000 in financing from Payroll Funding Corp. by fraudulently holding himself out as the owner of Revive You Media. In these negotiations, MARSH did not disclose that he had previously received financing by selling Revive You Media's receivables and was in default with Strategic Funding Source.

l. By at least May 2017 and continuing until his arrest in July 2017, MARSH solicited financing from Mazuma Capital on two separate occasions. The first time, MARSH sought $3 million to finance the purchase of software from Wave Software in the name of Revive You Media. The second time, MARSH sought $1 million to finance the purchase of software from Wave Software by Technologists, Inc. As part of the second request, MARSH sent documents in which he made unauthorized use of the name and PII of SA, the real CEO of Technologists. MARSH also forged the signature of SA. As MARSH well knew, neither Revive You Media nor Technologists Inc. had authorized him to negotiate these deals, had any interest in purchasing software from Wave Software, and were unaware that MARSH was seeking to encumber their companies. MARSH would have been the financial beneficiary of both deals.

51. In our about 2010, Marsh filed for bankruptcy in the Eastern District of Virginia and had debts associated with an unsuccessful real estate venture discharged. Although discharged debts should not be claimed, Marsh continued to claim these real estate losses on his federal income tax returns, which had the effect of him paying little to no taxes.

52. In order to further the wire fraud scheme, MARSH opened bank accounts in the name of Revive You Media with Wells Fargo Bank and PNC Bank. MARSH also opened a bank account in the name of Marsh Associated Services at Wells Fargo Bank. To open these accounts, MARSH fraudulently registered "Revive You Media" in Wyoming, and obtained an Employer Identification Number ("EIN") from the Internal Revenue Service ("IRS"). MARSH then used these accounts to receive proceeds from the fraud, including

from Strategic Funding Corp. and Payroll Funding Corp. MARSH also falsified bank statements for the Revive You Media account so that they appeared to come from Marsh Associated Services, which he provided to Tiger Finance.

53. In total, MARSH unsuccessfully attempted to obtain more than $10.9 million in financing by fraudulently using the identities of real companies Revive You Media, Technologists, Inc., Wave Software, Venesco and Marsh Associated Services. MARSH continued to use the identities of these companies in June and July 2017 to fraudulently seek funding, even after he was aware that federal agents were investigating him for wire fraud and identity theft associated with Revive You Media. At no time did MARSH have permission to use the identities of Revive You Media, Technologists, Inc., Venesco, or Marsh Associated Services. Further, as MARSH well knew, he was never authorized to hold himself out as the owner of these entities or secure financing on their behalf.

54. The acts taken by MARSH in furtherance of the offenses charged in the Criminal Information, as well as the acts described above, were done willfully and knowingly, with the specific intent to violate the law. They were not the result of accident or mistake.

55. MARSH was a knowing participant in the scheme and offenses charged in the Criminal Information and the actions discussed herein. At no time did MARSH force anyone to participate. Further, MARSH participated freely and voluntarily.

56. The defendant, KIRK RUSSEL MARSH, acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offense charged in this case.

      Respectfully submitted,

      Dana J. Boente
      United States Attorney

By: _____
      Katherine L. Wong
      Assistant United States Attorney

After consulting with my attorney and pursuant to the Plea Agreement I entered into with the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Kirk Russel Marsh
Defendant

I am Kirk Russel Marsh's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Elizabeth Mullin, Esquire
Attorney for Kirk Russel Marsh