**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 1:17-CR-122-AJT |
| | ) | The Hon. Anthony J. Trenga |
| KIRK RUSSEL MARSH, | ) | Sentencing: November 17, 2017 |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

_____

**DEFENDANT KIRK RUSSEL MARSH'S MEMORANDUM IN AID OF SENTENCING**
_____

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

OBJECTIONS TO THE PSR ............................................................................................... 2

I.    A 20-Level Loss Amount Enhancement Under § 2B1.1(b)(1) is not Supported by the Evidence in the Record and Would Contravene the Parties' Plea Agreement ........................... 2

II.   The 2-Level Sophisticated Means Enhancement Under § 2B1.1(b)(10) Does Not Apply Because no Aspect of the Offense Conduct is "Especially Complex or Especially Intricate" ... 5

BACKGROUND ................................................................................................................... 6

I.    History and Characteristics of the Defendant ................................................................. 6

II.   The Offense Conduct ................................................................................................... 10

   a.   Virginia Commonwealth Bank ................................................................................. 11

   b.   Fulton Bank .............................................................................................................. 11

   c.   Operating Wave Software ......................................................................................... 13

   d.   Attempted Purchase of Revive You Media ............................................................. 13

   e.   Arrest, Admission of Guilt, and Cooperation ......................................................... 14

SENTENCING ARGUMENT ............................................................................................ 18

I.    The Advisory Guidelines Substantially Overstate Mr. Marsh's Culpability and Warrant a Downward Variance ............................................................................................................. 19

   a.   The Applicable Loss Amount Substantially Overstates Mr. Marsh's Culpability ......... 20

   b.   The Application of Multiple, Overlapping Enhancements Unnecessarily and Unfairly Increases Mr. Marsh's Guidelines Range .............................................................................. 23

II.   The Factors The Court Must Consider Under § 3553(a) Weigh In Favor of a Sentence No Longer than 42 Months ......................................................................................................... 25

   a.   A Sentence of No Longer than 42 Months is "Just Punishment" in Light of the Seriousness of Mr. Marsh's Crimes and the Significant Personal and Professional Collateral Consequences He Has Already Suffered .............................................................................. 26

   b.   A Sentence of No Longer than 42 Months Will Protect the Community and Deter Mr. Marsh and Others From Committing Similar Crimes ........................................................... 29

   c.   A Sentence of No Longer than 42 months Will be Consistent with Sentences Received by Offenders in Similar Cases and Avoid Unwarranted Sentencing Disparities .................. 32

   d.   A Sentence of No Longer than 42 Months Will Maximize the Restitution Mr. Marsh is Able to Provide to the Victims of his Crimes ...................................................................... 36

CONCLUSION .................................................................................................................... 36

## INTRODUCTION

Mr. Marsh comes before this Court for sentencing following his guilty plea to one count of bank fraud under 18 U.S.C. § 1344 ("Count 1"), one count of aggravated identity theft under 18 U.S.C. § 1028A ("Count 2"), and one count of wire fraud under 18 U.S.C. § 1343 ("Count 3").   Mr. Marsh is a 39-year-old father of three with no prior criminal record.  He has never lived a life of decadence or largesse.   To the contrary, his life has been shaped by his commitment to his young family and service to his church and community.  Mr. Marsh knows what he did was wrong and that he alone bears responsibility for his actions.  His actions were inexcusable, and although they originated in a misguided notion of helping others and providing for his family, Mr. Marsh knows that he has caused significant harm to former colleagues and others, substantial losses to several companies, and, ultimately, intense pain to his shocked and betrayed family.

Pursuant to 18 U.S.C. § 3553(a), Rule 32 of the Federal Rules of Criminal Procedure, and Section 6A1.3 of the advisory United States Sentencing Guidelines ("U.S.S.G."), Mr. Marsh, by counsel, states that he has received and reviewed the Presentence Investigation Report ("PSR"), and offers the following objections: (i) the PSR incorrectly assesses the applicable "loss amount" and its incorrect assessment results in a loss amount that is significantly higher than the amount to which the parties stipulated and (ii) the PSR incorrectly applies the "sophisticated means" enhancement to relatively simple conduct.

Mr. Marsh submits that a variant sentence of no longer than 42 months is appropriate here because, among other relevant factors, he is a first-time offender who has already suffered greatly from the consequences of his arrest and conviction and who needs no additional

punishment to deter future criminality, and for whom a lengthy term of imprisonment would create sharp unwarranted disparities with sentences imposed on similarly situated defendants.

## OBJECTIONS TO THE PSR

Mr. Marsh objects to the advisory Guidelines calculation for Count I and Count III, which puts his sentencing range at 121 to 151 months of imprisonment (based on an Offense Level of 32 at Criminal History Category I).  *See* PSR ¶ 170.  Specifically, Mr. Marsh objects to two sentencing enhancements imposed by the PSR: (1) a 20-level enhancement for the loss amount attributed to Mr. Marsh under U.S.S.G. § 2B1.1(b)(1)(K) and (2) a two-level enhancement for the use of "sophisticated means" in committing the offense under U.S.S.G. § 2B1.1(b)(10)(C).

Notably, pursuant to the plea agreement between Mr. Marsh and the Government, the Government will recommend that the applicable loss amount should yield a 16-level enhancement.  *See* PSR ¶ 6.  Based on this joint recommendation by the parties, as well as Mr. Marsh's other objections, Mr. Marsh respectfully requests that the Court find that the correct Guideline range for Counts 1 and 3 is 63 to 78 months (Offense Level 26 at Criminal History Category I).  This Guideline range is supported by the facts and applicable law and, along with the mandatory 24-month consecutive sentence for Count 2, should be used as the starting point in determining Mr. Marsh's sentence, before considering the factors which militate in favor of a variant sentence.

Mr. Marsh has no objections to the factual portions of the PSR.

## I. A 20-Level Loss Amount Enhancement Under § 2B1.1(b)(1) is not Supported by the Evidence in the Record and Would Contravene the Parties' Plea Agreement

Mr. Marsh objects to the application of a 20-level enhancement for the loss amount attributed to him under U.S.S.G. § 2B1.1(b)(1)(K)(2).  Specifically, the $10,973,500

characterized by the PSR as "intended loss" should not be included in the overall loss calculation.

As an initial matter, it bears emphasis that after extensive negotiation, Mr. Marsh and the Government agreed to a 16-level enhancement which reflects a loss amount of between $1.5 million and $3.5 million.[1] "[A] stipulation as to the amount of loss in a plea agreement that is knowing and voluntary will generally govern the resolution of that issue . . . ." *United States v. Granik*, 386 F.3d 404, 411 (2d Cir. 2004); *United States v. Yooho Weon*, 722 F.3d 583, 589 (4th Cir. 2013) (holding that where defendant "stated under oath during the Rule 11 hearing that the factual stipulations in the [plea] agreement were true and correct . . . those factual stipulations remained binding in the absence of any demonstrated exceptional circumstances"). The plea agreement was the subject of extensive negotiations and, like all plea agreements, reflects reasoned compromises by both Mr. Marsh and the Government. *United States v. Knox*, 533 Fed. App'x 305, 306 (4th Cir. 2013) ("Plea agreements are grounded in contract law, and both parties should receive the benefit of their bargain.") (citing *United States v. Chase*, 466 F.3d 310, 314 (4th Cir. 2006)). The application of a Guidelines range different from that agreed to by the parties would undermine the integrity of the plea negotiation process by casting doubt on whether defendants can rely upon the application of the terms of plea agreements they successfully negotiate. The parties agreed to a reasonable estimate of the loss in this case and that agreement should not be set aside lightly.

Consistent with the parties' agreement, Mr. Marsh contends that the PSR incorrectly includes $10,973,500 as intended loss. This amount reflects the aggregate amount of the unsuccessful financing applications he submitted to obtain financing related to Revive You

---

[1] This amount is based on an actual loss amount of $3,052,908.42. *See* PSR Addendum at 34; *see also* PSR ¶ 82 (actual loss of $2,456,908.42); PSR ¶ 81 (actual loss of $596,000).

Media.  *See* ¶ 82. With respect to these attempts to obtain financing, however, there is no evidence that he "purposefully sought to inflict" pecuniary harm on the institutions because the record before the Court demonstrates that he intended to repay the line of credit by selling and financing Revive You Media.[2] *See* U.S.S.G. § 2B1.1 cmt. 3(A)(ii) (defining intended loss as pecuniary harm the defendant "purposefully sought to inflict"); *see also United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) ("A defendant who applied for, or caused someone else to apply for, a $1 million loan, fully expecting at least $250,000 to be repaid, intended a loss of no more than $750,000 . . . ."); *United States v. Tedder*, 81 F.3d 549, 551 (5th Cir. 1996); *United States v. Moored*, 38 F.3d 1419, 1427-28 (6th Cir. 1994); *United States v. Hughes*, 775 F. Supp. 348, 350-51 (E.D. Cal. 1991).[3] There is also no evidence in the record that he intended to close on all of his attempts for financing. *See United States v. Confredo*, 759 F. Supp. 2d 347, 352 (S.D.N.Y. 2010) ("[A] defendant who applied, or caused someone else to apply, for multiple loans expecting some of them to be rejected only intended the loss of the remaining loans . . . .") (citing *Confredo*, 528 F.3d at 152).  Rather, Mr. Marsh was making a desperate attempt—however misguided—to fund the purchase of Revive You Media, sell it for a profit, and repay

---

[2] The loss amount, including Mr. Marsh's intent to cause any losses, must be proven by a preponderance of the evidence based on the available information in the record. *See United States v. Catone*, 769 F.3d 866, 876 (4th Cir. 2014) (citations omitted).

[3] The PSR Addendum argues that Mr. Marsh should be held accountable for $10,973,500 in "intended loss," despite stating explicitly that "[t]he Probation Office does not dispute the fact *the defendant may have intended to pay back the funds* by selling and financing Revive You Media." PSR Addendum at 33 (emphasis added).  The fact that Mr. Marsh "entered into an agreement to purchase Revive You Media using false and fraudulent information" and that he "knew or, under the circumstances, reasonably should have known these losses were a potential result of the offense," *id.* (which Mr. Marsh has admitted) have no bearing as a matter of law on what amount of loss he "purposefully sought to inflict." U.S.S.G. § 2B1,1 cmt. 3(A)(ii).  Courts have roundly rejected the argument put forward in the PSR: "'[I]ntended loss' means a loss the defendant *purposefully* sought to inflict.  'Intended loss' does not mean a loss that the defendant knew would result from his scheme or a loss he might have *possibly and potentially* contemplated." *United States v. Manatau*, 647 F.3d 1048, 1050 (10th Cir. 2011) (emphasis original) ("Something is intended if it is done on purpose—not merely known, foreseen, or just possible or potentially contemplated.").  Indeed, "where the defendant intends to repay the loan or replace the property, the intended loss is zero." *United States v. Henderson*, 19 F.3d 917, 928 (5th Cir. 1994).  So too here.  Instead of accepting this legally dubious position, the Court should hold Mr. Marsh accountable for the total loss amount of $3,052,908.42, which results in a 16-level enhancement.  *See* PSR Addendum at 34.

4

his creditors. Because he did not purposefully intend to inflict pecuniary loss, his attempts to obtain financing should not be included as "intended loss" under § 2B1.1. This would result in the loss amount to which the parties agreed in the plea agreement.

## II.     The 2-Level Sophisticated Means Enhancement Under § 2B1.1(b)(10) Does Not Apply Because no Aspect of the Offense Conduct is "Especially Complex or Especially Intricate"

Mr. Marsh objects to the application of the two-level "sophisticated means" enhancement under U.S.S.G. § 2B1.1(b)(10)(C) because (1) the actions described in his offense conduct are inherent in the fraudulent scheme to which he has pled guilty and (2) Mr. Marsh did not engage in "especially complex or especially intricate offense conduct" in committing the offense.[4]  At its core, Mr. Marsh's conduct involved various misrepresentations in different contexts in order to distribute and secure financing in the form of loans and lines of credit, including through the acquisition and unauthorized use of other individuals' identities in carrying out the fraudulent scheme.  But the complexity and sophistication of the offense conduct must be more than what is inherent in the elements of the crimes themselves.   As the Fourth Circuit has explained, "virtually all bank fraud will involve misrepresentation, which includes unauthorized acquisition and use of another's information."  *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014).

Nor does any individual aspect of Mr. Marsh's fraud demonstrate the degree of sophistication required for the two-level enhancement under U.S.S.G. § 2B1.1(b)(10)(C).  His conduct involved relatively simple steps accessible to a wide swath of the general public.  He forged various signatures and used others' personal information in submitting and approving fraudulent loan documents, but "[t[he presence of forgeries or stolen identification, and a plan to

---

[4] In addition, as described below, even if Mr. Marsh's conduct was technically "sophisticated" (though it was not), applying the enhancement is unfairly cumulative and should not be applied in this case.

use such material to wrongfully acquire moneys, does not necessarily amount to sophistication." *See Adepoju,* 756 F.3d at 259.

Additional steps taken by Mr. Marsh may appear sophisticated at first glance, but are relatively simple tasks in today's increasingly interconnected digital economy.  Purchasing and registering a domain name is "simple and inexpensive for any person."  *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 493 (2d Cir. 2000); *see also United States v. Executive Recycling, Inc.*, 953 F. Supp. 2d 1138, 1167 (D. Colo. 2013) ("[I]f the Court were to find that the use of a website—particularly one as rudimentary as Executive Recycling's website—constituted 'sophisticated means', then the enhancement would apply in nearly every fraud case, which surely could not have been the Sentencing Commission's intent when it adopted this enhancement guideline.").  Fraudulently registering a company and securing an Employer Identification Number (EIN) is a straightforward process.  *See Adepoju*, 756 F.3d at 257 ("Additionally, the government conceded that obtaining an EIN, even for a falsified company, 'is something that's not too difficult to do.'").  "[O]pening a bank account requires not sophistication but merely the proper paperwork."  *Id.* at 254.  The Court should sustain Mr. Marsh's objection because there is nothing "especially complex or especially intricate" about his offense conduct.

## BACKGROUND

### I.      History and Characteristics of the Defendant

Mr. Marsh is a 39-year-old man with no prior criminal history.  As a young child, he moved from New York to Virginia with his parents, Kirk and Shawnee.  PSR ¶ 139.  He has two siblings: an older sister, Tiffany, and a younger brother, James.  *Id.* ¶ 140.  Other than two years in Brazil on a church mission and several years in Idaho and Utah for college, he has lived in

Virginia all his life.  *Id.* ¶ 141.  Mr. Marsh and his wife of almost ten years, Lauren, have three children: girls ages 7, 5, and 2. *Id.* ¶ 143.

Mr. Marsh attended Brigham Young University, first in Idaho and then at the main campus in Provo, Utah, and received a bachelor's degree in political science.  *Id.* ¶ 151.  He later earned a Masters of Business Administration from George Mason University and a Diploma from the Virginia Bankers School of Bank Management at the University of Virginia.  *Id.* ¶¶ 149, 150.

Mr. Marsh began his career in banking in 2002 at a Navy Federal Credit Union call center.  *Id.* ¶ 159.  He later worked at Mercantile Potomac Bank for two years and Chevy Chase Bank for one year.  *Id.*  From 2007 to 2008, Mr. Marsh was employed as a Lending Officer with Wachovia Bank in Tysons Corner, Virginia.  *Id.* ¶ 158.  After a short stint at Eagle Bank, in August 2009 Mr. Marsh began working as a Vice President for Government Contract Lending at Virginia Commonwealth Bank ("VCB") in Chantilly, Virginia.  *Id.* ¶¶ 156.  He worked there until November 2012, when he took a position as a Lending Officer at Fulton Bank in Herndon, Virginia.  *Id.* ¶ 155.  He was terminated from that position in September 2015 in connection with the instant offense conduct.  *Id.*

Mr. Marsh also engaged in investment activities, hoping to earn money to support his family.  In 2006, he and his father formed Marsh Investment Group, LLP and purchased 150 rental properties in Mississippi for $4.9 million.[5]  *Id.* ¶ 122.  Despite providing additional funds and personally guaranteeing loans, the investment quickly went south and the properties were foreclosed on.  *Id.*  Mr. Marsh and his father brought suit against the sellers, alleging fraud, negligent misrepresentation, and conspiracy.  *Id.*  The court held a bench trial in early 2009, but found against Mr. Marsh and his father and denied them the damages they sought.  *Id.*; *see also*

---

[5] The PSR incorrectly states that this investment was of $49 million. *See* PSR ¶ 122.

*Marsh v. Wallace*, 666 F. Supp. 2d 651 (S.D. Miss. 2009).  Facing almost $4 million in personal liabilities, Mr. Marsh filed for bankruptcy in April 2010.  *Id.* ¶ 123.  The combination of the failed investment, the protracted litigation, and his personal bankruptcy left Mr. Marsh devastated and concerned about his ability to provide for his family.

In 2014, as described below as part of the offense conduct, Mr. Marsh fraudulently acquired the company Wave Software.  Since then, he has served as the company's Chief Executive Officer.  But this business venture also failed, with the company losing all its customers and apparently most of its value by 2017.

Mr. Marsh's family, community, and church are the most important things in his life.  His devotion to his family, especially his wife and three daughters, is unmistakable.  His wife describes him "as a devoted husband in the way he treated me and the way he cared for me." L. Marsh Ltr., Ex. 1 at 1.  But most of all, she recognizes that "he has always been a wonderful father to his girls."  *Id.*  ("They love him with all their hearts and, in their minds, he truly hangs the moon.").  Beyond his wife and daughters, Mr. Marsh has a strong network of family and friends in Northern Virginia, including his parents and his siblings.

To his friends and family, Mr. Marsh is a warm and generous person who is always willing to help those in need.  They invariably describe him as gentle, kind, caring, and patient. *See, e.g.*, C. Waddell Ltr., Ex. 1 at 10; R. & O. Kulbeth Ltr., Ex. 1 at 31; E. Kulbeth Ltr., Ex. 1 at 19.  Whenever something needed to be done—big or small—he didn't wait to be asked, he simply rolled up his sleeves and did what needed to be done.  His father-in-law notes that "[h]e has donated hundreds of hours of volunteer time in the years we have known him."  C. Waddell Ltr., Ex. 1 at 10.  He has served as the coach of his daughter's soccer team and, as a former Eagle Scout, he has also served as a scout leader.  His cousin Katherine remembers that over the years,

"[t]he first that Russel says when he walks into a family gathering is 'can I help with something?'"  K. Richards Ltr., Ex. 1 at 25.  Another cousin has observed him in recent months and notes that "[h]e continues to put the welfare of others above that of himself and gives generously of himself to those around him."  J. Bennett Ltr., Ex. 1 at 24.  Other family members and friends describe similar situations.  *See, e.g.*, A. Alder Ltr., Ex. 1 at 16 ("We don't have to ask; he just volunteers and insists on doing it.").

Mr. Marsh is an active and devout member of the Church of Jesus Christ of Latter-day Saints, also known as the Mormon Church.  As a 21-year-old, Mr. Marsh took a leave of absence from college to spend two years on a mission in Brazil, sharing his faith with others.  PSR ¶ 141.  His commitment to his faith has stayed strong over the years.  His cousin's wife observes that "[t]o the best of my knowledge, he has attended church each week for his entire life and held multiple volunteer positions within the church serving members of the congregation in various capacities . . . ."  E. Kulbeth Ltr., Ex. 1 at 19.  Mr. Marsh also volunteers widely, serving "in his church and community."  C. Waddell Ltr., Ex. 1 at 10.  A lengthy letter from Mr. Marsh's former bishop testifies to his dedication to his faith, including serving as part of the congregation leadership.  B. Brandenburg Ltr., Ex. 1 at 13.

Matching the portrait of a man of deep faith who strives to help others in his community, Mr. Marsh has always lived a modest lifestyle.  He lived with his family in an unpretentious home in the community of Oakton, Virginia.  The family of five has two cars, a 2002 Toyota his wife has owned since college and a recently acquired used minivan that fits three car seats to transport their daughters.  *See* S. Marsh Ltr., Ex. 1 at 8.  Mr. Marsh's father describes his son as a man who "has always been frugal with his money and ha[s] not lived extravagantly."  K. Marsh Ltr., Ex. 1 at 5.  According to his father-in-law, he "has been modest

in the cars he has purchased, the clothes he wears, the vacations they have taken, and even the home they purchased."  C. Waddell Ltr., Ex. 1 at 11; *see also* S. Marsh Ltr., Ex. 1 at 8 ("Instead of buying household items new, he obtained most of their furniture from Craig's List.  Many of the children's clothes were acquired from consignment shops or sales.").  According to a close family friend, he "is a down-to-earth person, content with living a relatively modest, ordinary life in the company of his wife, kids, and close friends."  A. Alder Ltr., Ex. 1 at 17.  In line with the frugal lifestyle described by his friends and family, neither the Government nor the PSR have identified a single luxury expenditure associated with Mr. Marsh's criminal conduct.

## II.    The Offense Conduct

This portrait of Mr. Marsh—a devoted father and husband, dedicated church member, Eagle Scout and scout leader, generous and patient friend and relative who thinks constantly of others' needs—stands in stark contrast to the man depicted in the PSR.  While the PSR accurately describes the offense conduct, it lacks context in certain areas that may be helpful to the Court, especially regarding what financial benefit Mr. Marsh derived from the various loans and lines of credit that he fraudulently caused to be issued and his decent, yet ultimately profoundly misguided, motivations in carrying out the fraudulent conduct.  *See United States v. Blake*, 89 F. Supp. 2d 328, 332 (E.D.N.Y. 2000) ("In determining a sentence, it is worth attempting to understand (as best one can) what set a defendant upon [an] illegal course."); *see also Pepper v. United States*, 562 U.S. 476, 487 (2011) ("[T]he sentencing judge [must] consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (citation omitted).

### a.  *Virginia Commonwealth Bank*

While he served as a loan officer at VCB, Mr. Marsh forged signatures and created fraudulent documents to distribute twelve loans or lines of credit to individuals and small business he felt were deserving of funding.  Without Mr. Marsh's intervention, some of these individuals and small businesses may not have been eligible to receive loans from VCB.  But he neither received any funds from these loans nor did he intend to do so.  It was not his judgment to make, but he fraudulently caused the loans to be issued out of a misplaced desire to help others obtain financing, not a desire to get rich.  *See* PSR ¶¶ 35, 36.  Two loans are currently in default (in the amounts of $93,900.67 and $50,005.31, minus VCB's recovery of offsetting funds), but the other ten loans and lines of credit have been paid in full.  The PSR accurately calculates the actual loss from Mr. Marsh's offense conduct at VCB as $143,905.98.  *Id.* ¶ 37.

### b.  *Fulton Bank*

After he started at Fulton Bank in 2013, Mr. Marsh engaged in a fraudulent scheme to induce the bank to approve several lines of credit.  The PSR accurately calculates the actual loss from Mr. Marsh's offense conduct at Fulton Bank as $1,486,783.28.  *Id.* ¶ 78.

### i.    Line of Credit for SGI Global LLC

While at Fulton Bank, Mr. Marsh prepared fraudulent documents, including a letter with forged signatures and documents containing misrepresentations regarding the loan's guarantor, to approve a $5 million line of credit for SGI Global LLC ("SGI"), a management consulting firm.  Fulton Bank ultimately approved a $5 million line of credit for SGI.  *Id.* ¶ 41.  That account is still current and Mr. Marsh received no funds drawn from the SGI line of credit.  Fulton Bank incurred no losses as a result of approving this line of credit.  *Id.*

### ii.      Line of Credit for the Purchase of Wave Software

In 2014, Mr. Marsh entered into an agreement to purchase the company Wave Software for $1.8 million from PF.  *Id.* ¶¶ 44, 45.  PF had been a client of Mr. Marsh's at VCB.  In that capacity, Mr. Marsh had approved PF's application for a $500,000 loan and a $250,000 line of credit on behalf of Wave Software.  *Id.* ¶ 40.  No question of impropriety has been raised with respect to this loan and line of credit.  Mr. Marsh also personally gave PF a personal loan.  *Id.*

As part of this agreement, Mr. Marsh assumed the title of Chief Executive Officer of Wave Software.  *Id.* ¶ 44.  To secure part of the purchase price, he used his position at Fulton Bank to obtain a $1 million line of credit, in part by using another person's name and personal information without authorization.  *Id.* ¶¶ 42, 43.  Mr. Marsh made various payments to PF, including a draw of $583,000 on the line of credit to pay off existing credit lines for Wave Software and a $350,000 transfer to a Wave Software account under PF's control at VCB.  *Id.* ¶ 43.  The $1 million line of credit is currently in default in the amount of $1,049,639.57, resulting in an actual loss under the Guidelines of the same amount.  *See id.* ¶ 52.  Mr. Marsh still owes PF $800,000, plus interest, which similarly resulted in a corresponding actual loss amount under the Guidelines.  *Id.* ¶ 45.

### iii.      Line of Credit for XS

In 2014, Mr. Marsh caused the approval of a $125,000 business line of credit at Fulton Bank for XS, despite knowing that he intended to use drawn funds for personal expenses, including his children's tuition.  *Id.* ¶ 46.  Mr. Marsh later raised the line of credit to $485,000. *Id.* ¶ 49.  At some point during this period, XS began working at Wave Software and became an employee of Mr. Marsh.  *Id.* ¶ 46.  In 2015, he drew $40,000 on the line of credit for the use of Wave Software to cover employee payroll expenses.  *Id.* ¶ 47.  Later in 2015, Mr. Marsh drew

over $120,000 against the line of credit to repay a personal loan he had made to Wave Software. Mr. Marsh then used these funds to make the down payment on a home in Oakton, Virginia. *Id.* ¶ 49. The record does not specify the personal gain Mr. Marsh received from this line of credit. In total, however, $437,143.71 was drawn against this line of credit and this amount is currently in default, resulting in an actual loss of that same amount under the Guidelines. *Id.* ¶¶ 52, 78.

### c. *Operating Wave Software*

After he purchased Wave Software, Mr. Marsh tried to run it as a profitable company, but ultimately he could not make it work. Running out of cash, Mr. Marsh became desperate for additional funds to keep Wave Software afloat. In March 2016, he applied to two different loan providers to pay the company's operating expenses. One was unsuccessful, but Headway Capital ultimately provided Wave Software with a loan for $35,000. *Id.* ¶ 53. Mr. Marsh owes $26,219.16 on that loan, which the PSR has included as an actual loss. *See id.* ¶ 79. Mr. Marsh tried desperately to fix the problems he had created, but managed only to dig himself a deeper hole. He fell behind in paying expenses associated with Wave Software, including the salaries of his employees. By 2017, Wave Software had lost all of its employees and could not service current or new clients. *See id.* ¶ 55.

### d. *Attempted Purchase of Revive You Media*

In mid-2016, deeply in personal debt and with Wave Software run into the ground (and still not having told his wife or other family members about his financial and legal troubles), Mr. Marsh approached the owner of Revive You Media to express interest in purchasing the company. *Id.* ¶ 63. A few months later he entered into a purchase agreement to acquire the company for over $5 million, including $2 million in the company's cash reserves. In entering

this agreement, Mr. Marsh did not disclose his significant personal debts or his lack of sufficient funds to execute the purchase agreement. *Id.* ¶ 63.

Around this same time and despite not having authorization to act on behalf of Revive You Media, Mr. Marsh induced Act-On Software to obtain various marketing automation services for the company. *See id.* ¶ 68(a). The value of those services totaled $96,000 and that amount is accurately included in the PSR as actual loss. *Id.*

He then engaged in what can only be described as a series of desperate attempts to secure financing from various entities in order to save Wave Software and rectify his financial predicament. He used others' personal and financial information without authorization— including that of Revive You Media and its owner—to make some of these applications. *Id.* ¶ 68. Only two applications were successful. The first was $350,000 in financing from Strategic Funding Source in exchange for the sale of a portion of Revive You Media's receivables, despite that Mr. Marsh did not have authorization to enter that agreement. The PSR accurately calculates an actual loss of $379,090 attributable to this transaction. *Id.* ¶ 81 n.6. The second successful financing was $150,000 in financing from Payroll Funding Corporation. The PSR accurately calculates an actual loss of $78,000 attributable to this transaction. *Id.* ¶ 81 n.7. The remainder of Mr. Marsh's applications and related activities are fully described in the PSR. *See* ¶ 68. Suffice it to say as irrational as his conduct had become, he never intended to cause any entity or individual pecuniary harm.

### e. *Arrest, Admission of Guilt, and Cooperation*

Mr. Marsh was arrested on July 26, 2017. PSR ¶ 1. On July 28, he appeared at a preliminary detention hearing before Magistrate Judge Theresa Buchanan. Judge Buchanan ordered Mr. Marsh free on bond under to the supervision of a third-party custodian. *Id.* ¶ 2.

Because a suitable custodian could not be found on short notice, he was remanded to detention at the Alexandria Detention Center. *Id.* On August 17, Mr. Marsh waived indictment and pled guilty. *Id.* ¶ 4. Following his guilty plea, this Court released him to the supervision of his sister. *Id.*

Since then, Mr. Marsh has cooperated fully with Probation Officer Tracey White in the preparation of the presentence report. *Id.* ¶ 96. He has an unblemished record of full compliance with his stringent conditions of pre-trial release. *Id.* ¶ 16.

*   *   *   *   *   *   *   *   *   *   *   *   *

Mr. Marsh did not set out on his path of deceit to get rich or live a life of luxury. As described above, he has lived a modest life over the past four decades, dedicated to his family, community, and church. There is no evidence in the record that Mr. Marsh used any of the funds received for lavish personal gain, nor is there any allegation that Mr. Marsh spent more than a fraction of these funds on himself. Indeed, other than using a portion of the funds drawn from Fulton Bank as a down payment to purchase their relatively modest family home, there is not a single reference in the entire record of any personal expenditure by Mr. Marsh.

In piecing together what led him to where we are today, Mr. Marsh has been introspective and acknowledged the misguided thinking that resulted in deceit and criminality. As he stated to the Probation Officer, he is "beginning to gain insight into why I did what I did." PSR ¶ 96. He originally fraudulently obtained Wave Software from a former client, but quickly ran into financial trouble and incurred significant debts. But rather than cutting his losses and admitting his crimes, he desperately tried to obtain funding for Wave Software to pay off the outstanding obligations. He "tried to fix it by even more dishonest actions and attempting to justify them to myself, and I ended up making everything worse and hurting more people." R.

Marsh Ltr., Ex. 2 at 1; *see also* PSR ¶ 96 ("As I spiraled downward, my actions became increasingly reckless and desperate.").  Digging his self-made hole deeper, he tried "to make everything go away without affecting others and letting anyone know how much trouble [he] was in."  R. Marsh Ltr., Ex. 2 at 1.

Those closest to him have struggled to understand his motivation to commit these crimes. To them, his actions were simply impossible to reconcile with the man they know.  *See* L. Marsh Ltr., Ex. 1 at 1 ("[A]s his wife it is almost unfathomable to accept the deception that took place in what I considered a healthy, happy marriage and home."); C. Waddell Ltr., , Ex. 1 at 11 ("I'm still confused at what his motivation was for the crimes he committed, because it wasn't to live a lavish lifestyle."); L. Black Ltr., Ex. 1 at 26 ("Russel's actions that led to these charges are completely and so far out of character for the Russel that I know and admire, that I was in disbelief when I heard the news."); A. Alder Ltr., Ex. 1 at 17 ("I [have] tried to sort through what occurred and why, there are still things I don't fully understand."); C. Kulbeth Ltr., Ex. 1 at 18 ("It was extremely difficult to reconcile the Russel I know and love with someone with so little regard for others.").

But to the extent one can make sense of Mr. Marsh's crimes, his inexcusable conduct seems to have resulted from a profoundly misguided desire to help others and a desperate need to provide for his family.  His sister noted that "his supportive and hopeful view of people and desire to help others is partly why he is in this current situation."  T. Deskins Ltr., Ex. 1 at 3; *see also* C. Kulbeth Ltr., Ex. 1 at 18 ("I think that [his eagerness to help others] is indicative of Russel's character, so much so that his desire to see others happy has led to criminal activity."); A. Alder Ltr., Ex. 1 at 17 ("I do not believe that Russel's intentions were malicious.  I do not think he meant or intended to actually harm anyone.").  Especially after his 2010 bankruptcy,

Mr. Marsh was increasingly distressed about being able to provide for his family.  His cousin Jared acknowledged the pressure Mr. Marsh faced, stating that he "can imagine that Russel felt desperation to give his family opportunities."  J. Kulbeth Ltr., Ex. 1 at 22. "His desire to provide overrode his judgement and led to reprehensible actions."  *Id.*  Perhaps no part of the record corroborates this desperation more than the fact that throughout his financial troubles and increasingly severe legal situation, Mr. Marsh did not once confide in his wife.  She learned of his years-long course of criminal conduct and her family's precarious financial position only when law enforcement agents came to their home early on the morning of July 25, 2017 to arrest her husband.  *See* PSR ¶ 138; *see also* L. Marsh Ltr., Ex. 1 at 1 ("Literally nothing could have shocked me more than to learn that the FBI was there to complete a search and seizure warrant, as well as arrest Russ on federal charges.").

Notably, one of Mr. Marsh's victims, Ronaldo Gomes, shares this understanding his motivation.  In early 2017, Mr. Marsh approached Gomes for "help for him to close a deal that would bring improvement for his family."  Victim Impact Statement of Ronaldo Gomes, PSR at 36.  Mr. Marsh then used Gomes' identification to apply for additional funding.  When informed of Mr. Marsh's fraud, Gomes was in "shock" and "felt cheated and used by a good friend who [he had] always admitted and respected."  *Id.*  Yet Gomes, after all that he had been put through, did not ascribe malicious motives to Mr. Marsh:

> What I believe is that all of this was a snow ball that got out of control.  Russ made mistakes and poor choices and to repair or cover that, he had to make more mistakes and more poor choices.  I believe he had the best intentions for him and his beautiful family at first, but this took him to a road where [he] ended up in this terrible situation.

*Id.*

No part of the above attempts to absolve Mr. Marsh of his crimes.  He knows that he committed serious crimes and caused serious harm to others.  While his misguided intentions represent a serious failing, Mr. Marsh submits that they are an important part of this Court's "unique study in [his] human failings." *Pepper*, 562 U.S. at 487 (citation omitted).  It is apparent that the criminal conduct at issue in this case represents a terrible deviation—but a deviation still—from his life of good works and dedication to his family and community.  Mr. Marsh respectfully requests that the Court consider this fact in imposing an appropriate sentence for his offense conduct.

## SENTENCING ARGUMENT

The Sentencing Guidelines are neither mandatory nor presumptively reasonable.  The sentencing range that results from calculating a defendant's Criminal History Category and Offense Level is just one of various factors the Court must weigh in choosing a sentence that is sufficient but not greater than necessary to accomplish the goals set forth in 18 U.S.C. § 3553 (a)(2).  While the Guidelines range may serve as a "starting point and the initial benchmark," a sentencing court must make an "individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 49-50 (2007).  A sentencing court may find that "the Guidelines sentence itself fails [to] properly reflect § 3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007).  But it is "procedurally unreasonable" (and reversible error) for a sentencing court to "presume that the appropriate sentence in a given case will come from the Guidelines." *United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010) (citations omitted).

Under § 3553(a), the Court is required to impose a sentence that is "sufficient, but not greater than necessary," in light of various factors, including the following: (1) "the history and

characteristics of the defendant," (2) "the nature and circumstances of the offense," (3) the need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (4) the need "to afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant," and (5) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and (6) "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(1)-(7).

In this case, even a proper application of the Sentencing Guidelines results in a sentence range that is far greater than necessary to accomplish the purposes of sentencing set forth by Congress. That Guideline range is driven overwhelmingly by a single criterion—loss amount— and exacerbated by the application of multiple, overlapping enhancements for similar conduct. A sentence within that range (even at the low end) would be unreasonable in light of the individualized assessment that the Court is required to undertake. *See Pepper*, 562 U.S. at 488 (holding that sentencing courts must "ensure[] that the punishment will suit not merely the offense but the individual defendant") (citation omitted).

A fair reading of the factors that must comprise the Court's analysis counsels in favor of a sentence consisting of a term of imprisonment no longer than 18 months on Counts 1 and 3 and 24 consecutive months on Count 2, for a total sentence of no longer than 42 months.

**I.  The Advisory Guidelines Substantially Overstate Mr. Marsh's Culpability and Warrant a Downward Variance**

A court may vary downward from the advisory range established by the Guidelines where application of the factors under § 2B1.1 "substantially overstates the seriousness of the offense." U.S.S.G. § 2B1.1 cmt. n. 20(C). Here, Mr. Marsh's advisory Guidelines range is overwhelming driven by (i) the 16-level enhancement for the loss amount between $1.5 and $3.5

19

million and (ii) application of overlapping and cumulative offense enhancements that functionally address the same underlying conduct.   While Mr. Marsh's fraudulent criminal conduct warrants a significant sentence, his applicable Guidelines range is comparable to those applied to defendants convicted of some of the most heinous offenses in the criminal justice system.   That is untenable and need not be accepted by the Court.   Mr. Marsh respectfully submits that these circumstances justify a significant downward variance from the applicable Guidelines range.

### a. The Applicable Loss Amount Substantially Overstates Mr. Marsh's Culpability

The advisory sentencing range applicable to Mr. Marsh—even after sustaining Mr. Marsh's objections—significantly overstates "the moral seriousness of the offense" and should therefore be given minimal weight under 18 U.S.C. § 3553(a)(4).   *See United States v. Emmenegger*, 329 F Supp. 2d 416, 427 (S.D.N.Y. 2004).   The offense level calculated in this matter is overwhelmingly driven by the enhancement for the loss amount under U.S.S.G. § 2B1.1.   The PSR incorrectly proposes that a 20-level enhancement be applied to Mr. Marsh's Guidelines range based on unsupported speculation regarding intended loss.   Mr. Marsh objects to this enhancement, instead requesting that the Court apply the 16-level enhancement that the parties agreed to in the plea agreement and that is supported by the record.   But regardless of the loss enhancement applied, these levels are irrational on their face.

No other enhancement in Section 2B (governing economic crimes) reaches anywhere near this level.   Indeed, Section 2A (governing violent crimes), does not have *any* double-digit offense enhancements.   Examples of other double-digit enhancements in the Guidelines include a 15-level enhancement for trafficking in portable rockets, *see* U.S.S.G. § 2K2.1(b)(3)(A), and a 12-level enhancement for committing a felony to promote terrorism, *see* U.S.S.G. § 3A1.4(a).

Imposing a sentence on Mr. Marsh driven largely by a 16-level loss enhancement is patently unreasonable.

These absurd results are even more pronounced when total offense levels are considered. Adding the 16-level loss enhancement to the base offense level of 7 results in an initial offense level of 23 (before any other adjustments), an offense level equivalent to that of many heinous and violent crimes.   An offense that includes bombing of an airport, aircraft, or mass transit facility yields a base offense level of 24, *see* U.S.S.G. § 2K1.4(a)(1) and the distribution of child pornography for financial gain involving a minor younger than 12 yields a total offense level of 25, *see id.* § 2G2.2(a)(1) (base offense level of 18 increased by 7 levels for financial gain and the age of the minor).   Adding applicable enhancements takes any Guideline range for Mr. Marsh's offense conduct significantly higher than these reprehensible crimes.   If a regime that purports to reflect the criminal justice system's morality and values—even one that is only advisory—calculates that the appropriate punishment range for Mr. Marsh's offense conduct is comparable to those who bomb airplanes and public transportation, then that system should be viewed with considerable skepticism.   To the extent that Mr. Marsh's advisory range under that system is *higher* than these offenses, it should be rejected out of hand.

Courts have recognized this bizarre and pernicious imbalance, branding the loss table under Section 2B1.1 "a black stain on common sense."   *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008).   The loss table's enhancements "appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice."   *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012); *see also United States v. Faibish*, No. 12-CR-00265, 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) ("The loss table is but one example of the seemingly mindless acceleration of

penalties for economic crimes incorporated in the current Sentencing Guidelines regime."). The outsized role of the loss table is "[o]ne of the primary limitations of the guidelines, particularly in white collar cases." *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wisc. 2005); *see also United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016) (remanding for sentencing court to reconsider Guidelines sentence "in view of the significant effect of the loss enhancement in relation to the low base offense level").

Not only is the offense level yielded by the loss amount grossly disproportionate relative to Mr. Marsh's conduct, but its potentially outsized impact on his sentence leaves little room to consider myriad other facts, including his motivations in committing the fraud. *See Blake*, 89 F. Supp. 2d at 332 ("In determining a sentence, it is worth attempting to understand (as best one can) what set a defendant upon [an] illegal course."). Mr. Marsh was misguided and desperate, but nonetheless carried out his deceitful and fraudulent scheme with the intention of helping others and supporting his family. *See, e.g.*, T. Deskins Ltr., Ex. 1 at 3. ("I feel his supportive and hopeful view of people and desire to help others is partly why he is in this current situation."). But "the guidelines treat a person who steals $100,000 to finance a lavish lifestyle the same as someone who steals the same amount to pay for an operation for a sick child." *Ranum*, 353 F. Supp. 2d at 990. In this case, Mr. Marsh's motivations are not accounted for in the Guidelines and they suggest a significantly lower level of culpability than a typical fraud defendant.

The Guidelines' singular focus on the loss amount also obscures the defendant's gain. Here, the amount of loss applicable to Mr. Marsh's offense conduct far outpaces his gain from his crimes. The Department of Justice itself has recognized that, where "personal gain to the defendant" is dwarfed by the loss amount, a below Guidelines sentence may be warranted. *See* Sentencing Commission Pub. Hr'g, Comments of Preet Bharara at 45-46 (Feb. 16, 2011); *see*

*also* David Debold & Matthew Benjamin, *"Losing Ground"—In Search of a Remedy for the Overemphasis on Loss and Other Culpability Factors in the Sentencing Guidelines for Fraud and Theft*, 160 U. PA. L. REV. PENNUMBRA 141 (2011) ("As the DOJ has acknowledged, cases in which loss greatly exceeds a defendant's gain are likely candidates for below-guidelines variances.").

Where, as here, a single factor is the driving force behind a Guidelines range and that factor vastly overstates a defendant's moral culpability, a sentencing court may find that "the Guidelines sentence itself fails [to] properly . . . reflect § 3553(a) considerations." *Rita,* 551 U.S. at 351. Mr. Marsh respectfully submits that the Court should reject a wooden application of the loss table as incongruous with the Supreme Court's admonition to make an "individualized assessment based on the facts." *Gall*, 552 U.S. at 50.

### b. The Application of Multiple, Overlapping Enhancements Unnecessarily and Unfairly Increases Mr. Marsh's Guidelines Range

Mr. Marsh has objected to the application of the "sophisticated means" enhancement because his conduct was not especially complex or intricate. But even accepting that each relatively simple aspect of Mr. Marsh's fraud scheme renders his conduct "sophisticated" as a whole, the very aspects of his conduct that might be considered "sophisticated" are already accounted for by other enhancements. While each of these elements could, without more, make offense conduct "sophisticated," together they represent an untenable "piling-on" of enhancements under the Sentencing Guidelines. *See United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006); *see also United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (holding that a downward departure is appropriate "when the addition of *substantially overlapping enhancements* results in a significant increase in the sentencing range minimum (as it does at the higher end of the sentencing table)"), *vacated and remanded in light of United*

23

*States v. Booker*, 543 U.S. 1097 (2005).  This Court should recognize that application of this enhancement is unfairly cumulative and adjust Mr. Marsh's sentence accordingly.

At bottom, what arguably tips Mr. Marsh's fraudulent scheme into the realm of "sophisticated" is its scale.  In other words, its purported sophistication is the result of a fraudulent scheme by a corporate insider with a high loss amount and a large number of victims.  But "[a]ny case involving a corporate officer and a multimillion-dollar loss will almost always trigger application of multiple offense-level enhancements that have the effect of punishing the defendant over and over for the same basic thing—conducting a big fraud in a corporate setting." Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 FED. SENT'G REP. 167, 170 (2008); *see also* Samuel W. Buell, *Overlapping Jurisdictions, Overlapping Crimes: Reforming Punishment of Financial Reporting Fraud,* 28 CARDOZO L. REV. 1611, 1648-49 (2007) (factors such as sophisticated means and large number of victims "double-count because they are captured by other enhancements or by the loss calculation").

Each arguably "sophisticated" aspect of Mr. Marsh's offense is already addressed by a different enhancement.  The scale and duration of the offense conduct is already functionally addressed by the loss amount and the enhancement for an offense involving 10 or more victims. *See, e.g.*, *United States v. Jackson*, 346 F.3d 22, 26 (2d Cir. 2003) ("Most fraud schemes that obtain more than one half million dollars involve careful planning, some sophisticated techniques, and are extensive.").  Mr. Marsh only had access to the information he abused because of his positions of authority at VCB and Fulton Bank, but that aspect of his offense conduct speaks not to his sophistication in carrying out his crimes but to his abuse of a position of trust in doing so.  And that abuse of trust is already specifically accounted for in a separate two-level enhancement under U.S.S.G. § 3B1.3.  *See* U.S.S.G. § 3B1.3 cmt. n. 3 ("For example,

24

the adjustment applies in the case of a defendant who . . . perpetrates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker . . . .  In making the misrepresentation, the defendant assumes a position of trust, relative to the victim, that provides the defendant with the same opportunity to commit a difficult-to-detect crime that the defendant would have had if the position were held legitimately.").  Finally, Mr. Marsh's forgeries and use of others' means of identification in carrying out his fraud is already subject to a 24-month *consecutive* sentence under 18 U.S.C. § 1028A.

While such "double-counting" is technically permissible, it is certainly not required where, as here, it would unfairly ratchet an individual's guideline sentence to an unfair level. Indeed, the sentencing court is "free to consider policy decisions behind the Guidelines" and to adjust a sentence based on its rejection of an otherwise applicable sentencing enhancement. *United States v. Nolasco-Ramirez*, 391 Fed. App'x 309, 311 (4th Cir. 2010).  The Sentencing Commission itself recognized over a decade ago that "as more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness."  U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing* at 137 (Nov. 2004).  To pile on yet another two-level enhancement would subject Mr. Marsh to an unreasonable sentence in light of his offense conduct.  The cumulative effect of the "sophisticated means" enhancement weighs in favor of a below-Guidelines sentence.

## II.     The Factors the Court Must Consider Under § 3553(a) Weigh In Favor of a Sentence No Longer than 42 Months

Under 18 U.S.C. § 3553(a), the Court must impose a sentence "sufficient, but not greater than necessary" to achieve the goals of federal criminal sentencing.  Here, Mr. Marsh respectfully submits that a total sentence of no longer than 42 months (18 months on Counts 1

and 3 and 24 consecutive months on Count 2) meets that objective and is appropriately tailored to Mr. Marsh's personal background and individual offense conduct.

a. ***A Sentence of No Longer than 42 Months is "Just Punishment" in Light of the Seriousness of Mr. Marsh's Crimes and the Significant Personal and Professional Collateral Consequences He Has Already Suffered***

A sentence of no longer than 18 months on Counts 1 and 3 is a significant sentence that is proportionate to the seriousness of Mr. Marsh's offense conduct, particularly because Mr. Marsh will also receive an additional and *consecutive* 24-month sentence on Count 2. This punishment is serious and reflects the importance of punishing those who engage in fraudulent conduct. Mr. Marsh recognizes that he committed serious offenses and that they caused personal and financial harm to many individuals and significant losses to several companies. He has accepted responsibility for his actions by admitting his guilt and cooperating fully with the Probation Office's preparation of the PSR. His own words confirm his remorse: "I know what I did was wrong and I am profoundly ashamed of myself." R. Marsh Ltr., Ex. 2 at 2.

A total sentence of no longer than 42 months is also appropriate given the additional collateral consequences Mr. Marsh has already incurred and will face for the rest of his life. Courts recognize that while a term of imprisonment is often the starting point of an offender's "just deserts," punishment comes in many forms and must be tailored to the individual circumstances of each offender. *See Pepper,* 562 U.S. at 488 (holding that sentencing courts must "ensure[] that the punishment will suit not merely the offense but the individual defendant"); *Gall*, 552 U.S. at 54 ("[A] sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed merely as a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.") (citation and quotation marks omitted). The collateral consequences a defendant

faces can inform the Court's calculation of a proper retributive punishment. *See, e.g.*, *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (holding that the loss of a defendant's "teaching certificate and his state pension as a result of his conduct" are appropriate considerations "consistent with § 3553(a)'s directive that the sentence reflect the need for 'just punishment' and 'adequate deterrence'") (citations omitted).

These consequences have already been severe and weigh heavily in favor a sentence significantly below the Guidelines range.  Regardless of the length of his sentence, Mr. Marsh's professional career in banking and finance is over and his ability to provide for his family is irreversibly altered.  *See, e.g.*, *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (holding that the sentencing court properly considered under 18 U.S.C. § 3553(a)(2)(A) that the "conviction itself already visit[ed] substantial punishment" on the defendant by likely barring him from future work in his chosen profession); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting a downward departure where defendant was already punished by the loss of his business as a result of his conviction).  Pursuant to the plea agreement, Mr. Marsh will face a forfeiture judgment of at least $8.6 million and a restitution obligation of approximately $2.9 million, PSR ¶¶ 9, 11, vast sums that far outpace the amount of money he personally received or that he will reasonably hope to ever repay.  *See id.* ¶ 161 (calculating defendant's net worth as negative $26,578.50 and monthly expenses as negative $12,566).  In addition, as a felon in Virginia, upon his release Mr. Marsh will be subject to a host of collateral consequences, from the loss of the voting franchise to the prohibition to sit on juries.  *See generally United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016).

Beyond these direct consequences, Mr. Marsh's reputation is also ruined, in his community and more broadly.  *See, e.g.*, *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir.

2008) (holding that the sentencing court properly considered the defendant's "atypical punishment such as the loss of his reputation"); *United States v. Roth*, No. 05-CR-00792-5, 2008 WL 686783, at *1-3 (N.D. Ill. Mar. 11, 2008) (imposing a sentence of probation, despite a Guidelines range of 63 to 78 months, in part because defendant had lost her law license and "[t]he publicity regarding her conduct ha[d] obviously caused her great embarrassment and humiliation"). Indeed, *The Washington Post* and other online media outlets have covered this case such that any search of Mr. Marsh's name leads inevitably to lengthy descriptions of his criminal conduct. Even after he completes his terms of imprisonment and supervised release, Mr. Marsh will never be able to shed the indelible mark left by his crimes, his arrest, and the sentence imposed by this Court.

But perhaps worst of all, Mr. Marsh's criminal conduct has irreversibly damaged his family relationships. *See* S. Marsh Ltr., Ex. 1 at 8 ("An extended period of incarceration [will] destroy[] Russel's family. This family is worth saving."). Mr. Marsh feels his guilt acutely and is "profoundly ashamed of myself." R. Marsh Ltr., Ex. 2 at 2. He recognizes that his crimes have effectively left his wife a single parent for years to come, forcing her to sell the family home, uproot their lives, and move across the country with their three daughters. Mr. Marsh also recognizes that his crimes will cause him to miss his daughters' childhoods. In his letter to the Court, he stated that this "breaks my heart the most: my three little girls don't know what is going on and I know someday I will have to explain to them that their dad made some very bad decisions that caused me to miss their childhood. I am working through that guilt but I know it will always be there." R. Marsh Ltr., Ex. 2 at 2. The guilt and shame Mr. Marsh feels as a husband and father who has let down his family is profound and no sentence of any length can match that punishment. *See* T. Deskins Ltr., Ex. 1 at 3. ("He understands those actions have

28

upturned his life and been the cause for much grief to those he loves.  I feel this has been a greater punishment that will continue beyond any court sentencing; the loss of time with his children while he fulfills his sentence.").

In light of the above, Mr. Marsh respectfully submits that a sentence of no longer than 42 months imprisonment is sufficient but not "greater than necessary" given the seriousness of his crimes and the need to impose a "just punishment."

### b. A Sentence of No Longer than 42 Months Will Protect the Community and Deter Mr. Marsh and Others From Committing Similar Crimes

The sentence imposed by the Court must accord due deference to the goals of protecting the community by deterring future criminal conduct, both by Mr. Marsh and others.  *See* 18 U.S.C. § 3553(a)(2)(B) & (C).  Here, a sentence of no longer than 42 months would be sufficient to deter Mr. Marsh from reoffending and send an appropriate signal of deterrence to those similarly situated.

The requirement to ensure sufficient specific deterrence "unquestionably envisions more severe sentences for defendants considered more likely to commit further crimes and less severe sentences for those unlikely to commit crimes."  *United States v. Rodriguez*, 724 F. Supp. 1118, 1120 (S.D.N.Y. 1989).  In this case, Mr. Marsh presents an objectively low risk to reoffend based on almost every possibly applicable factor, including his age, good mental health, lack of history of substance abuse, positive family relationships, and stable post-incarceration housing. The need for a lengthy sentence is thus substantially reduced.

First-time offenders like Mr. Marsh are statistically less likely to reoffend.[6]  *See, e.g.*, *United States v. Williams*, 662 Fed. App'x 366, 377 (6th Cir. 2016) (affirming a below-

---

[6] *See* U.S. Sent'g Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview*, at 5 (Mar. 2016), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

Guidelines sentence because the sentencing court "was motivated primarily by [the defendant's] lack of criminal history and her low risk of recidivism").  Offenders over the age of 40 "exhibit markedly lower rates of recidivism in comparison to younger defendants."  *United States v. Hernandez*, No. 03-CR-1257, 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005). Mr. Marsh is 39.  Other studies by the U.S. Sentencing Commission have found that college graduates have the lowest recidivism rate of any level of education studied (7.1%) and those convicted of fraud have the lowest recidivism rate of any offense category studied (9.3%).[7]  As Mr. Marsh's father-in-law stated, "there would be little benefit to society…little to gain…by having [him] serve a 'long' prison sentence."  C. Waddell Ltr., Ex. 1 at 11.

Mr. Marsh's supportive family and community represent another important factor in establishing a low likelihood of recidivism.  Offenders are less likely to reoffend when they have family contact during incarceration and positive family relationships after prison.[8]  Mr. Marsh is fortunate to have a strong family network that stands willing to ensure his successful reentry into society, whenever that occurs.  *See* K. Marsh Ltr., Ex. 1 at 6. ("He will be constantly reminded that deviations from the right path are unacceptable.  With continued support from his family and church, he is on a path to obedience and protection against future harm to himself and those around him.").  Offenders are also statistically less likely to reoffend when they have stable and

---

publications/2016/recidivism_overview.pdf ("A federal offender's criminal history was closely correlated with recidivism rates.").

[7] *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28-29 (May 2004).  The Commission's 2016 study found similar trends.  *See* U.S. Sent'g Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview, Appendix A-2* (Mar. 2016).

[8] *See* Mindy Herman-Stahl, Ph.D., et al., U.S. Dept. of Health & Human Services, *Incarceration and the Family: A Review of Research and Promising Approaches for Serving Fathers and Families*, at 1-3 (Sept. 2008), *available at* http://aspe.hhs.gov/hsp/08/mfs-ip/incarceration&family/report.pdf.

secure housing upon release.[9]  Mr. Marsh cannot predict where his family will reside when he is released, but he will be reunited with his wife and daughters and benefit from a stable home life.

Finally, the irreparable damage he has caused to his family is a major factor in deterring any future criminal conduct.  *See* T. Deskins Ltr., Ex. 1 at 3. ("I have watched as he has painfully only been able to see his daughters once a week.  The removal from his daughters' lives has already severely affected him with a desire to never commit these crimes again.").  His family will be a constant reminder of his crimes, and the terrible consequences that would ensue if he were to ever reoffend.  In Mr. Marsh's own words: "What breaks my heart the most: my three little girls don't know what is going on and I know someday I will have to explain to them that their dad made some very bad decisions that caused me to miss their childhood.  I am working through that guilt but I know it will always be there." R. Marsh Ltr., Ex. 2 at 2. The record before the Court establishes that a sentence of no longer than 42 months is sufficient to ensure that Mr. Marsh never again engages in these crimes.

When coupled with the severe personal, professional, and financial collateral consequences Mr. Marsh faces from his publicized arrest, forfeiture of assets, and multi-million dollar restitution obligation, even a modest sentence of imprisonment is sufficient to deter others in a position to commit a similar offense.  *See United States v. Vigil*, 998 F. Supp. 2d 1121, 1158 (D.N.M. 2014) (finding that, for a medical professional who improperly prescribed narcotics, a reduction from an offense level of 29 to 22 "is a considerable variance, [but] the sentence is still long enough to deter most people—particularly professionals—who might be tempted to engage in similar crime").

---

[9] *See* Marta Nelson et al., Vera Institute of Justice, *The First Month Out: Post-Incarceration Experiences in New York*, at *City* (Sept. 1999), *available at*
http://www.vera.org/sites/default/files/resources/downloads/first_month_out.pdf.

Even if those collateral consequences were insufficient to deter others similarly situated (and they are not), it is widely recognized that the certainty of a sentence is a more important deterrent to would-be white collar offenders than the length of the sentence.  *See, e.g.*, Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28-29 (2006) (noting that three National Academy of Science panels and "every major survey of the evidence" has reached the conclusion that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects"); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").   A lengthy prison sentence would be far "greater than necessary" to deter other professionals from committing similar offenses

### c.  *A Sentence of No Longer than 42 months Will be Consistent with Sentences Received by Offenders in Similar Cases and Avoid Unwarranted Sentencing Disparities*

Under 18 U.S.C. § 3553(a)(6), the Court must avoid unwarranted sentencing disparities among similar defendants.  Here, a sentence of no longer than 18 months for Counts 1 and 3 is appropriate given the requirement to avoid unwarranted sentencing disparities among similarly situated offenders.

Empirical studies of white collar sentences demonstrate that most offenders convicted of high-value fraud offenses are sentenced below the Guidelines range.  Indeed, "since *Booker*, virtually every judge faced with a top-level corporate fraud defendant [with an advisory range based primarily on the loss amount under § 2B1.1] has concluded that sentences called for by the Guidelines were too high."  Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds after* Booker, 20 FED. SENT'G REP. 167, 169 (2008).

In this district, sentencing courts often vary substantially from the advisory sentencing range in high-loss fraud cases. *See, e.g.*, *United States v. Ferrufino*, No. 1:09-CR-430-AJT (imposing a sentence of 34 months, despite advisory range of 97 to 121 months, after conviction at trial for conspiracy to commit bank and wire fraud); *United States v. Gezachew*, No. 1:10-CR-199-LMB (imposing a sentence of 30 months, despite advisory range of 78 to 97 months, after defendant pled guilty to conspiracy to commit bank fraud with a loss in excess of $18 million); *United States v. Pinkett*, No. 1:08-CR-437-LOG (imposing a sentence of 36 months after a 5K1.1 motion, despite an advisory range of 97 to 121 months based in part on an actual loss amount of $18.7 million); *United States v. Johnson*, No. 1:13-CR-305-LMB (imposing a sentence of 30 months, despite an advisory range of 108 to 135 months, after defendant pled guilty to conspiracy to commit wire fraud). For fraud cases featuring substantial enhancements for loss amount, below-Guidelines sentences are the norm.

In fraud cases coupled with aggravated identity theft convictions, courts in this district have also consistently imposed below-Guidelines sentences. This Court's 2013 sentence in *United States v. DiPasquale* is an important point of comparison for Mr. Marsh's sentence. In that case, defendant Kenneth DiPasquale pled guilty to one count of conspiracy to commit fraud under 18 U.S.C. § 1349 and one count of aggravated identity theft under 18 U.S.C. § 1028A. He had worked as a loan officer at a mortgage company and had committed widespread mortgage fraud, including by knowingly processing fraudulent loans for unqualified buyers and using stolen identities to process various loans. *See United States v. DiPasquale*, No. 12-CR-443-AJT, Position of the United States with Respect to Sentencing ("Govt. Sentencing Brief"), at 2-3 (ECF No. 52) (May 3, 2013). In exchange, DiPasquale received significant kickbacks to his personal bank account and earned commissions on fraudulent loan transactions. *See id.* The government

estimated he had caused over $3.3 million in actual losses.  *Id.* at 4.  DiPasquale was a first-time offender who was 38 years old when he was sentenced.  *See DiPasquale,* Position of the Defendant with Respect to Sentencing, at 6 (ECF No. 53) (May 7, 2013).

Based on these facts—including a loss calculation of over $2.5 million leading to an Offense Level of 33 and a Criminal History Category of I—the Probation Office recommended a sentencing range of 135 to 168 months on the fraud charge and 24 months consecutive for the aggravated identity theft charge, for a total range of 159 to 192 months.  *See DiPasquale,* Govt. Sentencing Brief, at 5.  The government accepted that this Guidelines range would "not be unreasonable" but argued for a sentence of 84 months, based largely on Mr. DiPasquale's co-conspirator having previously received that same sentence.  *Id.* at 8.

Despite these recommendations, the Court found that the proper Guideline range for the fraud count was 87 to 108 months (Criminal History Category I and Offense Level 29).  *DiPasquale*, Minute Entry (ECF No. 56) (May 10, 2013).  The Court then varied downward significantly and sentenced Mr. DiPasquale to 18 months on his fraud conviction.  *Id.*  With the mandatory 24 months for his identity theft conviction, Mr. DiPasquale's sentence came to a total 42 months.

While *DiPasquale* does not present a mathematical equivalent to Mr. Marsh's conduct in this case, Mr. Marsh submits that the two cases are sufficiently analogous that the Court should impose a sentence that is roughly equivalent.  Both cases involve non-violent, first-time offenders in their late thirties who worked to authorize loans, but abused their positions of trust to steal others' identities and authorize loans for unqualified applicants.  Both caused an actual loss of roughly $3 million.  Both received credit for acceptance of responsibility, but neither cooperated under U.S.S.G. § 5K1.1.  Of course, differences in their personal characteristics and

offense conduct exist, including their different socioeconomic backgrounds. But the pointed similarities between these two cases warrant using DiPasquale's 42-month variant sentence as an important guidepost in the Court's consideration of Mr. Marsh's sentence.

Another recent case is similarly instructive. In *United States v. Stopchinski*, the defendant pled guilty to one count of wire fraud and one count of aggravated identity theft. With a loss amount over $1 million and other enhancements, the Court found an offense level of 28 and, because the defendant was a first-time offender, calculated a Guidelines range of 78 to 97 months. *United States v. Stopchinski*, No. 10-CR-252-AJT, Minute Entry (ECF No. 78) (July 8, 2011). The Government asked for a sentence of 96 months (72 months for wire fraud and 24 months consecutive for identity theft) and the defendant requested a sentence of 24 months (probation for wire fraud and 24 months for identity theft). *Id.* The Court varied downward and sentenced the defendant to 36 months in prison (12 months for wire fraud and 24 months for identity theft). *Id.*

While the charges and Guidelines range in *Stopchinski* roughly approximate those in this case, the Court's statement of reasons for varying downward is even more instructive:

> The guideline's sentence was substantially determined by the apparent gain in this case, which overstates the level of culpability; the [defendant] is subject to other substantial consequences including the inability to sell insurance anymore as well as to pay restitution; this is the [defendant's] first criminal offense; the [defendant] has accepted responsibility for his actions; and the Court has received many letters describing the [defendant's] good qualities and works in the community.

*Id.* So too with respect to Mr. Marsh: his advisory range overstates his culpability, he is subject to significant collateral consequences, he is a first-time offender, he has accepted responsibility for his crimes, and he has received an outpouring of support testifying to his decent character and good works. As with *DiPasquale*, the similarities between the *Stopchinski* defendant's personal

35

characteristics and offense conduct and those of Mr. Marsh weigh strongly in favor of granting Mr. Marsh a significant downward variance.

No two cases are identical, but the above examples counsel in favor of a total sentence no longer than 42 months. A sentence of that length would avoid unwarranted disparities with cases where sentencing courts in this district have considered similar offense conduct with similar loss amounts by first-time offenders in the banking and finance industry.

### d. A Sentence of No Longer than 42 Months Will Maximize the Restitution Mr. Marsh is Able to Provide to the Victims of his Crimes

Mr. Marsh will be subject to a restitution judgment of approximately $3 million. The only way for him to begin to contribute further restitution to his victims will be to secure gainful employment after his release. A lengthy term of imprisonment would not only be far greater than necessary to achieve the other goals of sentencing under 18 U.S.C. § 3553(a), but it would also make it much more difficult for Mr. Marsh to begin to attempt to make whole the victims of his crimes. *See, e.g.*, *United States v. Rangel*, 697 F.3d 795, 803-04 (9th Cir. 2012) ("[T]he . . . goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a non-incarcerated and employed defendant.") (citation and internal quotation marks omitted). Mr. Marsh respectfully requests that the Court maximize his ability to make restitution to the victims of his crimes.

## CONCLUSION

For the foregoing reasons, Mr. Marsh respectfully asks the Court to impose a period of imprisonment no greater than 42 months (18 months for Counts 1 and 3 and 24 months, consecutive, for Count 2) to be followed by a significant period of supervised release. Mr. Marsh requests that the Court not impose a fine given his forfeiture judgment, large restitution obligation, and his inability to pay a fine. *See* PSR ¶ 168. With respect to his designation by the

Bureau of Prisons, Mr. Marsh requests that the Court recommend him for designation at FCI Cumberland in Cumberland, Maryland, which will allow him to be close to his family and allow his wife and daughters to visit him during his incarceration.  Finally, given his successful compliance with all regulations and conditions while released on bond, *see* PSR ¶¶ 15, 16, Mr. Marsh respectfully requests that the Court allow him to voluntarily surrender as directed by the Bureau of Prisons.

Respectfully submitted,

KIRK RUSSEL MARSH
By Counsel,

_____-s-_____
Attorneys for the Defendant

Elizabeth A. Mullin, Esq.                     Beau D. Barnes, Esq.
Virginia Bar No. 86668                        Pro Bono Counsel, *pro hac vice* application pending
Office of the Federal Public Defender         Kobre & Kim LLP
1650 King Street, Suite 500                   1919 M Street, NW
Alexandria, VA 22314                          Washington, DC 200036
(703) 600-0800 (telephone)                    (202) 664-1900 (telephone)
(703) 600-0880 (facsimile)                    (202) 664-1920 (facsimile)
Elizabeth_Mullin@fd.org                       Beau.Barnes@kobrekim.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 10, 2017, I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to the following:

Katherine L. Wong, Esq.
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700
Katherine.L.Wong@usdoj.gov

Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of the foregoing pleading will be delivered to Chambers within one business day of the electronic filing.  A courtesy copy will also be delivered by inter-office mail to Probation Office Tracey M. White.

_____-s-_____
Elizabeth A. Mullin, Esq.
Virginia Bar No. 86668
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800 (telephone)
(703) 600-0880 (facsimile)
Elizabeth_Mullin@fd.org