IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:17-CR-122 |
| | ) | |
| v. | ) | The Honorable Anthony J. Trenga |
| | ) | |
| | ) | Sentencing Date: November 17, 2017 |
| KIRK RUSSEL MARSH, | ) | |
| | ) | |
| Defendant. | ) | |

## POSITION OF THE UNITED STATES ON SENTENCING

The United States of America, by and through its undersigned counsel, in accord with

18 U.S.C. § 3553(a) and the United States Sentencing Commission, Guidelines Manual

("Guidelines" or "USSG"), respectfully files its position with respect to the sentencing of

defendant Kirk Russel Marsh ("Marsh" or "defendant").

The government has reviewed the Presentence Report ("PSR") and has no objections; it

agrees with its recitation of the relevant facts and circumstances.  The government agrees with

the enhancements assessed in the PSR, including a 2-level increase for 10 or more victims

(U.S.S.G. § 2B1.1(b)(2)(A)(i)), a 2-level increase for sophisticated means (U.S.S.G. §

2B1.1(b)(10)(C)), a 2-level increase for deriving more than $1 million in gross receipts from

1/more financial institutions as a result of the offense (U.S.S.G. § 2B1.1(b)(16)(A)), and a 2-

level increase for abuse of a position of public or private trust (U.S.S.G. § 3B1.3).  PSR

¶¶ 101-103, 105.

If the Court holds the defendant accountable for the intended loss, which is $13.4

million, the total offense level is 32 for Group 1 (for the bank fraud (Count 1) and wire fraud

1

(Count 3) offenses), which corresponds to a Guidelines range of 121 to 151 months imprisonment because the Defendant is a criminal history category I. PSR ¶¶ 100, 170. If the Court instead holds the defendant accountable for the actual loss of approximately $3.05 million, the total offense level with the enhancements is 28, which corresponds to a Guidelines range of 78 to 97 months imprisonment. PSR at 33-34 (noting a 16-level enhancement would apply if using actual loss).

Regardless of how the Court calculates the advisory Guidelines range, the government respectfully requests that the Court give the defendant the benefit of the plea agreement. Dkt. 19. As set forth in the plea agreement, the parties have agreed to recommend a 16-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A) and a 2-level enhancement for 10 or more victims. As discussed in more detail below, the government respectfully recommends that the Court impose the enhancements in the PSR for sophisticated means, receiving more than $1 million in gross receipts, and abuse of a position of trust. With these enhancements, the total offense level would be 28, which corresponds to a Guidelines range of 78 to 97 months' imprisonment.

Consistent with the plea agreement, government respectfully recommends that the Court impose a sentence of 84 months imprisonment on Counts 1 and 3, to run consecutive with the mandatory term 24 months on the aggravated identity theft charge (Count 2). The government also recommends that the Court impose a term of 3 years of supervised release on Counts 1 and 3, and 1 year of supervised release on Count 2, as well as order restitution and enter a forfeiture money judgment of $8.6 million.

## I.    PROCEDURAL BACKGROUND

In August 2015, the defendant was told that he was the target of a federal criminal investigation during a voluntary interview with Special Agents with the Special Inspector

2

General for Troubled Asset Relief Program ("SIGTARP") at the U.S. Attorney's Office in Alexandria, Virginia. Dkt. 20, ¶ 36. The defendant then participated in two additional interviews in September and October 2015, pursuant to a proffer agreement with the U.S. Attorney's Office for the Eastern District of Virginia.

In early June 2017, the government became aware of new, additional criminal conduct involving fraudulent attempts to obtain money and financing using the names and financial information of other, real companies. The government notified defendant's counsel at the time of these new allegations. Through additional investigation, the government uncovered multiple, ongoing attempts by the defendant to obtain financing for over a dozen different lenders and using a variety of new, different entities. Based on this additional investigation, the government obtained a criminal complaint charging the defendant with bank fraud and aggravated identity theft on July 25, 2017. Dkt. 1-2.

On July 26, 2017, the defendant was arrested on the criminal complaint. Dkt. 9. The defendant was detained pending a preliminary hearing on July 28, 2017. Dkt. 11. On July 28, 2017, the Honorable Magistrate Judge Buchanan found probable cause and ordered the defendant released on conditions of bond, including a third party custodian and GPS monitoring. PSR ¶ 2. The defendant was remanded pending identification and approval of a suitable third party custodian.

On August 17, 2017, the defendant pleaded guilty to a three-count criminal information charging him with bank fraud, aggravated identity theft, and wire fraud, pursuant to a written plea agreement. Dkt. 17, 19-20.

## II.    FACTUAL BACKGROUND

Over more than five years, until he was arrested in July 2017, Kirk Russel Marsh used the identities of his co-workers, clients, and even his own parents, to commit fraud.

3

The three counts in the criminal information reflect the three distinct phases of the defendant's criminal activity.  The also reflect the defendant's escalating efforts to enrich himself.

As set forth in the statement of facts, the defendant used his position at Virginia Commerce Bank ("VCB") to put the money and property of VCB at risk.  Sepcifically, he approved loans and lines of credit that did not meet VCB's lending criteria.  With nine different loans, the defendant created false and fraudulent paperwork to substantiate the approvals, including documents with the forged signatures of other bank officers, including an Executive Vice President and the Chief Executive Officer.  In at least one case, the borrower had already been rejected by VCB.  Because the loan amounts were smaller, Marsh had a large role in the underwriting and approval process for these loans.  In total, Marsh put $1.25 million of VCB's money at risk.

While the $1.25 million is, in itself, not necessarily a large amount for a financial institution, what Marsh did is far more serious than the number.  As an employee and bank officer, Marsh was supposed to safeguard the funds of VCB and ensure that borrowers met the lending criteria.  By falsifying the applications and fraudulently approving loans that did not meet VCB's criteria, Marsh also put his clients at risk.  Doing so is not, contrary to the defendant's suggestion, commendable.  See Dkt. 28, at 11.  Indeed, as the financial crisis demonstrated, lending criteria matter and are critical to ensuring that clients do not undertake more debt than they can truly afford.  "Marsh's intervention," as the defense characterizes it, does not make him a modern day Robin Hood.  Lending criteria are designed not only safeguard a financial institution, but to ensure that borrowers do not end up over their heads and with substantial debt that wreaks their credit and financial futures.  Though Marsh did not

4

personal receive the funds, it was nonetheless not his money to risk or loan.  Moreover, Marsh *did* benefit from approving these loans: VCB, like many financial institutions, had goals and performance criteria.  For loan officers such as Marsh, VCB tied performance assessments and bonuses to the number of loans that were funded and managed.

At Fulton Bank, the defendant continued to approve loans and lines of credit that did not meet the lending criteria.  One of them was a $5 million line of credit to SGI Global ("SGI").  In causing the approval of this line of credit, the defendant not only lied to his superiors at Fulton Bank, but to his clients, SGI.  The defendant falsely led SGI to believe that the line of credit could be approved without certain individuals or entities appearing on the loan paperwork or acting as guarantors.  As the defendant well knew, Fulton Bank would not approve the loan without these guarantors.  Without the knowledge or consent of SGI, Marsh created fraudulent documentation that he provided to Fulton Bank that listed various companies as guarantors on the loan.  He then provided different paperwork to the actual owners of SGI.  In doing so, Marsh betrayed the interests of his clients, who had expressly wanted to keep certain entities separate and apart from the business transaction, and put Fulton Bank at risk for up to $5 million.  While the defendant did not receive any funds from this line of credit, his performance at Fulton was based in part on successfully funding loans and lines of credit.

Two other lines of credit at Fulton Bank are important.  These are the $1 million line of credit ("LOC") issued to A.F., and the $485,000 LOC issued to XS.   Both LOCs were based on lies about who was getting the money and how it would be used.  Marsh oversaw both and was instrumental in their approval.  More concerningly, these two LOCs in 2014 mark the beginning of increasingly brazen efforts by the defendant to enrich himself.

To obtain the $1 million LOC, the defendant used the identity of A.F., the spouse of a then-client, P.F.  He abused his access to company documents for Wave Software, a real company that the defendant wanted for himself.  As part of the $1 million LOC "package" submitted to his superiors at Fulton Bank, the defendant created forged operating documents, some of which showed A.F. as the true owner of Wave Software.  Marsh also stated that the $1 million LOC was for Wave Software's operating expenses.

At the same time that he was telling Fulton Bank that the $1 million LOC was for his client's operating expenses, the defendant was also in the process of deceiving his longtime client, P.F., the founder and true owner of Wave Software.  Marsh told P.F. that he had found a buyer for Wave Software, who was located overseas and named "Mark Smith."  Marsh also falsely told P.F. that Mark Smith had asked him (Marsh) to temporarily run Wave Software.  Under this pretext, Marsh negotiated the sale of Wave Software – purportedly for Mark Smith – but actually for himself.  P.F. was falsely told that Mark Smith had sufficient capital and resources to invest in Wave Software, which were need to improve and update the company's products.  Marsh then used the $1 million LOC to pay part of the $1.8 million sales price for Wave Software.  To conceal his involvement, the defendant set up a shell company that "bought" Wave Software.  To date, the defendant has never paid P.F. the remaining $800,000.  Only long after the sale was finalized did P.F. come to realize that there was no Mark Smith, and that the true owner was the defendant.

After stealing Wave Software from P.F., the defendant established himself as the Chief Executive Officer ("CEO").  As described by one of Wave Software's former employees, the defendant did not have the experience or capital to run Wave Software.  Although Wave Software had clients, valuable intellectual property, and regular income from existing

contracts, the defendant routinely failed to pay his employees and diverted the company's money to pay his own expenses. The defendant also took money from a $485,000 LOC that he caused to be issued to XS. Some of that money went to cover Wave Software's payroll. The defendant also drew on XS's LOC to help cover the down payment for the defendant's personal residence, which he purchased for over $800,000.

Today, Wave Software is defunct: It has no employees and many of its clients are likely to leave (if they have not already), because there is no one to service their contracts or provide customer support. As a result of the defendant's knowing mismanagement, Wave Software is not worth close to the $1.8 million sales price.

Shortly after Fulton Bank fired the defendant and after he knew that he was under criminal investigation, Marsh began the most concerning and wide-ranging phase of his frauds. This fraud targeted small companies that provide short-term financing and working capital to small businesses. These companies are not large financial institutions. Rather, the money for these loans often comes from pooling the resources of individual investors.

The defendant approached over a dozen such companies and submitted funding applications. PSR ¶ 81. All of these applications were fraudulent; many were on behalf of companies that the defendant did not own, or have any authorization to represent. Several of them are real companies, including Revive You Media, Technologists Inc., and Venesco. The defendant knew about Technologists Inc. and Venesco because they were both his clients at VCB. The defendant appears to have learned about Revive You Media largely by chance; the unsuspecting, true owners of Revive You Media were attempting to sell the company and were entertaining offers from several different prospective buyers when Marsh reached out to them.

Although he did not have the money or any expertise in running an online company that sold cosmetics and health products, Marsh offered to buy Revive You Media for over $5 million dollars.  This offer, like the LOCs that preceded them and the funding requests that were to follow, was a lie.  Though Marsh obtained some financing over the months of "negotiations" with Revive You Media, he did not put any of it towards purchasing the company.  Nor, more significantly, did he ever seek financing to purchase Revive You Media.

Rather, calling on his own knowledge and expertise about what financial institutions typically request to underwrite such deals, Marsh used his purposed "offer" to extract real financial statements and records from Revive You Media.  He then used them to pose as the true owner of the company, and seek money from various lenders.  In securing financing, Marsh encumbered Revive You Media with debt – a company that he did not even own.  For example, in exchange for $350,000 from Strategic Funding Source (SFS), Marsh sold SFS the receivables for Revive You Media.  When Marsh defaulted on the loan, SFS, attempted to collect by going after Revive You Media.

While the defendant attempts to suggest that the financing applications in late 2016 through July 2017 were to "save" Wave Software and "rectify his financial predicament," the evidence shows that Marsh simply used the money to live on.  See Dkt. 28, at 16. By 2017, Wave Software had no employees.

The defendant's fraud, unfortunately, was not limited to Revive You Media.  The defendant also submitted funding applications based on fictitious business deals.  Although Marsh told the lenders that these were arm's length transactions for real goods/services between real companies, in fact Marsh was on both sides of the transaction, and was the only person who stood to benefit if the financing went through.  In these applications, Marsh used

the identities of real companies, including Marsh Associated Services, Venesco, Wave Software, and Revive You Media.  The amount requested in these applications ranged from $25,000 to $3 million.  Even when these deals did fund, Marsh did not use the proceeds to pay off his debts to Fulton Bank or P.F.  To make these deals appear legitimate, Marsh incorporated a Revive You Media in Wyoming, and obtained an Employer Identification Number ("EIN").  He created fraudulent incorporation paperwork, and used those documents to open two different bank accounts, which is where he directed the lenders to wire the loan proceeds.  Marsh also used the names of his parents, the true owners of Marsh Associated Services, on funding applications.  He created fraudulent bank statements for Marsh Associated Services, to make it appear that the company had sufficient assets to conduct the proposed business deal.  See Ex. A.

In at least two instances, to make it appear that there really were "two sides" to the proposed business deals, the defendant registered domain names and created fictitious email accounts at those domain names.  He then sent emails to the lender from an account in the name of R.G. @venescosoftware.com.  Even after the government became aware of Marsh's fraudulent use of Revive You Media and informed his then-counsel, the conduct continued: In late June 2017, Marsh submitted a $150,000 loan application to Payroll Funding Corporation. The same week that he was arrested, Marsh submitted a $3 million application to Mazuma Capital.

These loan applications are just some of the many steps that the defendant took in furtherance of his crimes.  What they show is the deliberate, calculated nature of them.  There are also the numerous financial transactions with over $1.5 million in proceeds from these frauds that the defendant personally received.  This number, importantly, do not include the

money that Marsh received – and spent on himself – from Wave Software.  That was additional gain to the defendant.

What the loss amounts and number of loan applications do not communicate is the true impact on others, including the small businesses and the owners of those businesses.  The true owners of Revive You Media trusted the defendant, and truly believed that he was going to buy their business, which they built from nothing.  As described in C.H.'s letter, the defendant has caused likely irreparable and incalculable harm through his selfish actions.  Not only is there lost time and money, but the lost opportunity of other, legitimate buyers.

The evidence also shows that the defendant used his friends, family, and prior job to commit these crimes.  In many instances, he personally charmed or cajoled the victims into a false sense of security. As set forth in the victim impact statements, the defendant's fraud has had devastating effects on many.  The money that the defendant took is lost, or spent.  And while the defendant may make much of the fact that the money he received cannot be traced to luxury automobiles or vacations, he overlooks that it can be traced to buying and paying for a home valued at over $800,000, which is a luxury to many Americans.  It also paid for an enviable lifestyle where his wife did not have to work, and where he paid bills with money stolen through lies.

## III.      THE ADVISORY GUIDELINES RANGE

The PSR's determination of the applicable guidelines and calculations is accurate.  PSR ¶¶ 98-121.  The applicable guideline is § 2B1.1, with a base offense level of 7.  In addition, the PSR recommends that the defendant's offense level should be increased by four specific offense characteristics: (i) a 2-level increase because his offense involved 10 or more victims (§ 2B1.1(b)(2)(A)(i)); (ii) a 2-level increase because the offense involved sophisticated means

(§ 2B1.1(b)(10)(C); (iii) a 2-level increase because the defendant obtained more than $1 million in gross receipts from one or more financial institutions as a result of the offense (§ 2B1.1(b)(16)(A)); and (iv) an adjustment for role in the offense (§ 3B1.3).  PSR ¶¶ 100-105.

The government agrees with the PSR that the defendant is entitled to a 2-level reduction for acceptance of responsibility pursuant to § 3E1.1(a), and hereby moves this Court, pursuant to § 3E1.1(b), for an additional 1-level reduction in the offense level for acceptance of responsibility. The defendant has agreed that 2-level increase for number of victims applies.

The defendant also appears to concede that the PSR properly assessed 2-level enhancements for both receipt of more than $1 million from one/more financial institutions and abuse of a position of trust.  See Dkt. 28. The statement of facts and the PSR support the imposition of both of these enhancements.  With respect to § 2B1.1(b)(16)(A), the defendant applied for and obtained the fraudulent $1 million line of credit from Fulton Bank using the name and PII for A.F.  The defendant then drew the entire $1 million to fraudulently purchase Wave Software.  In addition to those funds, the defendant received a portion of the funds drawn on the $485,000 fraudulent line of credit that he opened for XS.  The defendant made fraudulent draws on that line of credit to benefit himself.  PSR ¶ 49.  The money that the defendant received from these two lines of credit totaled more than $1 million in gross receipts.

The statement of facts and PSR similarly support an enhancement pursuant to § 3B1.3 for abuse of a position of trust.  In this case, the defendant gained access to the PII for A.F. because A.F.'s spouse, P.F., was a client of the defendant at VCB.  The defendant used his position as an officer of Fulton bank to cause the issuance and approval of the $1 million LOC

that he used to purchase Wave Software, as well as the approval of the fraudulent LOC for XS. In both cases, the defendant's superiors relied on his analysis and expertise as a loan officer in approving the loans. Later, the defendant used information about former clients, Technologists Inc. and Venesco, on fraudulent financing applications in 2016 and 2017. Because he was the loan officer for these companies, the defendant had access to a myriad of financial and private information about these clients. He used that access, and the trust placed in a loan officer when revealing such information, for his own personal gain. The defendant's position as a bank officer thus facilitated both the bank fraud and wire fraud schemes.

The defendant disputes the PSR's calculation of the loss amount, as well as application of the sophisticated means enhancement. The government will address both arguments below.

### A. Loss Amount, § 2B1.1(b)(1)(K)

If the Court chooses to hold the defendant accountable for intended loss, the government agrees that the intended loss is more than $13.4 million, which would correspond to a 20-level increase. As discussed above, regardless of what the Court determines the loss to be, the government respectively requests that the Court give the defendant the benefit of the plea agreement, and impose a sentence within the Guideline range of 78 to 97 months' imprisonment, which is based on a 16-level loss enhancement based on the actual loss.

Under the Guidelines, intended loss is the "pecuniary harm that was intended to result from the offense." U.S.S.G. § 2B1.1. In this case, the defendant sought over $10.9 million in financing from 13 different companies. PSR ¶ 82. The defendant argues that the Court should not consider these attempts, because the defendant "intended to repay the line of credit by selling and financing Revive You Media." Dkt. 28, at 6. The government respectfully disagrees: the defendant could not have intended to repay his debts in this manner, because he

never owned Revive You Media and thus could never have legitimately sold it or obtained the proceeds from such a sale.  If anything, the evidence strongly suggests that the defendant never truly intended to purchase Revive You Media, but instead used the pretext of purchasing the company to fraudulently obtain financial information that the defendant could use to enrich himself.

There is also no evidence that the defendant expected any of these financing requests to be rejected.  If anything, the defendant's multiple attempts suggested the applications were targeted and unique; the pretext for the different applications was based on different purported "deals," with several involving different companies.

### B.  Sophisticated Means, § 2B1.1(b)(10)(C)

The defendant argues that the sophisticated means enhancement should not apply because the actions that the PSR cites are "inherent in the fraudulent scheme."  The defendant also argues that his actions were not "especially complex or especially intricate," noting that many of the steps were "accessible to a wide swath of the general public."  Dkt. 28, at 5.

Application note 9 cites several examples of sophisticated means, including "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."  U.S.S.G. § 2B1.1, n.9.  In United States v. Adepoju, 755 F.3d 250 (4th Cir. 2014), the Fourth Circuit noted that the enhancement applies "where the entirety of a scheme constitutes sophisticated means, even if every individual action is not sophisticated."  Id. at 256.

Although the defendant cites Adepoju, the facts of that case are very different. In Adepoju, the government argued that the defendant must have acquired victim T.A.'s information by sophisticated means, but offered no evidence as to the manner.  Instead, the

district court asked the defendant for evidence that he acquired the information in a non-sophisticated manner.  Id.  The Fourth Circuit held that the use of T.A.'s identity, without more did not show that the defendant did anything "especially intricate or complex to obtain T.A.'s information or attempt to defraud a bank."  Id.  As the Fourth Circuit explained in United States v. Jinwright, 683 F.3d 471 (4th Cir. 2012), "a defendant need not utilize the most complex means possible to conceal his fraudulent activities in order for the court to find that he used sophisticated means."  Id. at 486. Rather, the court "need only find 'the presence of efforts at concealment that go beyond (not necessarily far beyond . . .) the concealment inherent in [the charged offense].'"  Id.  The Fourth Circuit also stated that a sentencing court "should consider the *cumulative impact* of the criminal conduct, for the 'total scheme' may be 'sophisticated in the way all the steps were linked together.'"  Id.

Taken individually or collectively, the Court should find that the defendant employed sophisticated means.  While the defendant is correct that anyone *could*: forge signatures, fabricate corporate documents for real companies, incorporate fictitious shell companies to commit the fraud, register fake domain names designed to mimic real companies, open fraudulent email accounts, use aliases, obtain an Employer Identification Number for the shell company, falsify and fabricate bank statements, and recruit a friend to legitimize the scheme by speaking to a prospective lender, none of these steps are inherent or essential to committing the charged offenses.  More importantly, taken together, they were complex and sophisticated.  Some of the fraudulent accounts or documents created or used by the defendant, are attached as Exhibit A.

This is not a case where the defendant simply forged another person's signature on one document.  Rather, this is a case where the defendant went to extensive lengths to fabricate

documents and paperwork to commit the fraud and make the applications appear legitimate. Not every defendant creates fake emails, opens multiple bank accounts in the name of shell companies to receive and conceal the receipt of fraudulent loan proceeds, or incorporates a similarly-named company in another state. These various steps helped to conceal the fraud, and make the defendant appear legitimate. Here, the fake email addresses and aliases made it appear that there were legitimate business deals  because there were truly 2 sides to each transaction. As set forth in some of the letters from the victims, many of these efforts *were* effective – they lent an air of legitimacy to the defendant and made the fraud more difficult to detect. For example, the defendant's manipulation of Revive You Media to obtain legitimate financial information, then use of that information to fraudulently seek financing, was not necessary, but substantially furthered the scheme and made it more difficult to detect the fraud.

## V.        OTHER SENTENCING FACTORS

In addition to considering the properly calculated sentencing guidelines range, this Court should also consider other factors identified in 18 USC § 3553(a). The government will address the most pertinent of those factors below.

### A.        Nature and Circumstances of the Offense

By any measure, this defendant's crimes were serious. As described in the PSR, the actual loss in this case is approximately $3 million. The defendant personally used or received the vast majority of that money; less than $150,000 is attributable to loans at VCB that went to others. By July 2017, Marsh had submitted fraudulent funding applications to over a dozen lenders, and would undoubtedly have submitted more, if he had not been arrested. If anything, the defendant's attempts to obtain money as time passed escalated in seriousness and scope.

Even after he knew that he was the target of a criminal investigation, the defendant purposefully sought out a victim, Revive You Media, and proceeded to use that company's identity to help himself.  He also had the true owners make important and critical business decisions based on his false representations about closing the sale soon.

The offense conduct is concerning not only because of the loss amount and number of victims, but because of its duration and detailed planning.  There is also no question that the defendant knew what he was doing was wrong because he came up with it.  He created the false and fraudulent documents used to start, continue, and advance the schemes.    Marsh's criminal activity changed and evolved over the years, including in ways that made it more difficult to detect.  This fraud was not the result of one mistake, or a momentary lapse in judgment: Over multiple years, the defendant took numerous steps so that he could successfully defraud his victims and conceal the criminal nature of his conduct.  Throughout, he used his education and experience in the financial sector to further his crimes.

This is also case where many of the defendant's victims knew him.  Several were formal clients.  Others were family and friends.  As described in the letters, the defendant used that trust and charisma to further the fraud and, especially later, benefit himself.  In many instances, the defendant personally lied to his victims, including the lenders and owners of Wave Software and Revive You Media.  It is also important to remember that several of the victims in this case were victims two or three times over, whose identities or companies were used several times over.

Defendant's crime, moreover, was motivated by greed.  Far from being impoverished, the evidence suggests that the defendant had previously held well-paid positions with different financial institutions.  In his statement to the Court, the defendant suggests that his intention was to help others.  But the theft of Wave Software truly helped no one but himself.  Further, the

defendant's claim that his use of Revive You Media's information and identity were to pay off outstanding obligations is belied by evidence as to how the defendant used the money, and the staggering nature of the debt owed compared to the amounts sought be lenders.  Far from being "reckless" and "desperate," the elaborate machinations that the defendant went to show the calculated and deliberate nature of his crimes.

Although the defendant does not have a criminal history, the instant offense demonstrates sophistication, planning, and deliberate choices.  The lengths that the defendant went to commit and continue the crimes, as well as their duration, show the extensive preparation and planning that was necessary for the frauds to succeed.

### B.      History and Characteristics of the Defendant

According to the PSR, the defendant had a stable and happy childhood.  PSR ¶¶ 138-142. The defendant is 39 years old and has 3 children with his wife.  By all accounts, the defendant has a supportive and close-knit family. Several of the defendant's family members live nearby, including the defendant's parents, whose company and identities were used by the defendant to perpetrate the most recent fraud.

The defendant is also well-educated. The defendant grew up in Fairfax, Virginia, graduated from high school, and received a degree in political science after attending college in Utah and Idaho. PSR ¶ 141.  The defendant has a Masters of Business Administration ("MBA") from George Mason University.  In 2013, he graduated from the Virginia Bankers School of Bank Management at the University of Virginia.  PSR ¶¶ 149-150.

From 2002 through 2015, the defendant worked for various financial institutions.  After beginning at a credit card call center for Navy Federal Credit Union, the defendant worked as a lending officer for Wachovia Bank and Eagle Bank.  The defendant then worked as a Vice

President for Government Contract Lending at VCB from August 2009 through November 2012. PSR ¶¶ 155-159.  While working for VCB, he earned over $110,000 a year.

The defendant last worked as a lending officer for Fulton Bank from December 2012 through September 2015.  PSR ¶ 155.  While working for Fulton Bank, the defendant made over $140,000 a year.

After he was fired by Fulton Bank, the defendant was self-employed as the CEO for Wave Software, which he acquired through fraud.  PSR ¶ 154.  At the time of the sale to Marsh, Wave Software was valued and sold for approximately $1.8 million. As discussed in W.H.'s victim impact statement, Wave Software foundered and ultimately failed under the defendant's management, who had neither the experience nor money to run the company.

The defendant's educational background, supportive family, and work history show that he has had many opportunities (far more than many defendants), and that his choice to commit the instant offense was conscious and voluntary.  At the time the defendant chose to steal over $1 million dollars from Fulton Bank to fraudulently buy Wave Software, the defendant was making more than $140,000 a year.  The defendant's stable job and salary suggests that his actions at Fulton Bank were motivated, at least in part, by greed.  Simply put, it appears that the defendant believed that he could make far more from Wave Software.  By installing himself as owner and CEO, the defendant had use and control of the company's money.  Rather than pay its employees, the defendant diverted substantial amounts to himself.  Money from Wave Software helped pay the mortgage on the defendant's home and maintained the defendant's lifestyle, which included having his wife remain home with the children, rather than having to work.

Although the defendant has produced many letters from family and friends attesting to his good character, that is often the case with white collar defendants who engage in fraud: The

18

people to whom the defendant is closest to do not see the criminal side of the defendant and may want to believe the best.  Family members, such as spouses, often also benefit from the defendant's actions, which in this case included several years of living a lifestyle far beyond the defendant's true means.  This includes an $800,000 home, which was purchased in part using fraud proceeds.

If anything, the defendant appears to have used his background and his banking experience to further his fraud.  Several of the defendant's victims are former clients.  Unbeknownst to them, the defendant used their company's names and identities to submit fraudulent funding applications for nonexistent deals.  The financing applications in 2016 and 2017 reflect the defendant's knowledge of the financial industry, as well as the typical type of due diligence conducted before underwriting a deal.  To make the deals appear legitimate, the defendant did not simply forge a few signatures.  Rather, he incorporated a shell company, registered similar domain names, and created fictitious email addresses.  He also used aliases so that it would appear that there were truly "two sides" to each deal.  These actions reflect planning, sophistication, and intent.

While the defendant may have been a good father and husband, the defendant's choices and conduct with respect to the instant offenses are hardly a good role model for his children.  Unfortunately, as in most cases, a defendant's choices have collateral consequences for his family, particularly his children.  Marsh is no different from other defendants who commit serious crimes and have children; he is better off in the sense that he has family members who are willing to help.  Marsh's desire to be there for his children, however, does not warrant a departure or variance from the Guidelines range.

### C.  Promote Respect for the Law

Section 3553(a)(2)(A) also requires the sentence to "promote respect for the law."  The defendant's actions in this case show a marked disrespect for the law.

The defendant has known since August 2015 that he was the target of a federal criminal investigation. In September 2015, he was confronted and fired by Fulton Bank, because of his fraudulent conduct.  What sets this case apart from others is that the defendant did not stop.  Rather, he found new ways to steal money, first from Wave Software, a real company that he stole from its owner, and later from various business and lenders, who thought they were financing real business deals for actual companies.

As described by a former employee of Wave Software, the defendant used Wave Software to enrich himself.   While the defendant may not have spent it on luxury goods or extravagant vacations, the evidence does show that the defendant used the money earned by Wave to live and pay personal expenses, at the direct expense of the employees and the best interests of the company.  Employees were falsely led to believe that they would be paid.  Marsh falsely blamed the payroll issues on external factors when, in fact, the cause was the defendant's diversion of company money for himself.  As the defendant well knew, the fault was not because he switched payroll companies, or because investors/banks were not providing timely funding.  As Marsh knew, there were no other investors in Wave Software.

As a result of the defendant's actions, for all practical purposes Wave Software no longer exists.  Far from furthering the vision of the original owner, P.F., who had hoped that the new owner would inject capital and update Wave Software's products, the sale accomplished precisely the opposite.  To effect the sale, as described above, the defendant constructed an elaborate set of lies about how he was merely facilitating a sale to a foreign owner named "Mark Smith."  Mark Smith did not exist.

Even as Wave Software began to fail, the defendant did not stop.  Instead, he started an entirely new, separate scheme.   As C.H. describes in his letter, the offer was for over $5 million dollars.  As Marsh well knew, he did not have the money to complete the purchase.  Nor is there evidence that he ever sought financing with the stated purpose of purchasing Revive You Media. Rather, all the evidence suggests that the defendant posed as a buyer so he could gain access to the company's financial information, which he could then use to obtain financing.  Although he was now on the other side of the deal as the borrower, Marsh used his training and experience to further this fraud.   He used Revive You Media's true financials to legitimize his financing applications, and continued to string along C.H. about purchasing the company.

Marsh's criminal conduct was not one isolated act.  The defendant first defrauded his employer, Fulton Bank, before turning on his clients and using their information to steal money from unsuspecting lenders.  These lenders were not all large institutions.  In fact, many represent and pool money from individual investors.  That money, as set forth in the PSR, was largely lost or spent.  The financial harm, however, is not easily tallied in this case, because of the reputational harm and opportunity cost to the small businesses that the defendant used and manipulated.  Wave Software has gone out of business.  The defendant victimized the true owners of Revive You Media not simply by fraudulently encumbering their business, but also by depriving them of the opportunity to sell their company to other, legitimate buyers.  That opportunity is lost.

Further, the defendant's history, which includes the submission of a fraudulent bankruptcy petition and filing of false tax returns that claim credit for a debt discharged in bankruptcy, concerningly suggest that the defendant's actions were not an isolated event or

anomaly.  Rather, they are indicative of a person who knows what the law is, but can and does repeatedly disregard it, particularly if it is financially beneficial.

### D.    Adequate Deterrence to Criminal Conduct

The Court must also consider the need for the sentence imposed to afford adequate deterrence. 18 U.S.C. § 3553(a)(2).  In this respect, the government respectfully submits that a guidelines sentence is also justified.

A guidelines sentence is also appropriate to further the goal of general deterrence. General deterrence is arguably even more important in fraud cases, which are often difficult to detect, investigate, and prosecute, particularly when much of the conduct occurs overseas.  *See, e.g. United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crime are 'more rational, cool, and calculated than sudden crimes of passion or opportunity' these crimes are 'prime candidates for general deterrence.'").  This case, in particular, demonstrates how difficult it can be to detect ongoing fraud: Even after the defendant had been interviewed pursuant to a proffer agreement, the government only became aware of the wire fraud scheme (Count 3), due to a tip from local law enforcement in June 2017.  By that time, the defendant had been engaged in that fraudulent conduct for over a year, having submitted dozens of fraudulent applications for loans and financing.  The defendant was also able to and did continue submitting fraudulent financing applications until he was arrested in July 2017.

Because of the potential benefits and rewards from this type of crime, a sentence of imprisonment is necessary to deter others, who might view home confinement or short sentence of imprisonment as acceptable risks, given the substantial financial rewards that financial crimes can afford.  General deterrence is also important because identity theft and bank fraud are

disturbingly easy to commit, and can have devastating effects on the individuals or companies whose information is misappropriated.  That is why courts have recognized that deterrence alone can justify a lengthy sentence.  See, e.g., United States v. Phinazee, 515 F.3d 511, 515-16 (6th Cir. 2008); United States v. Sagendorf, 445 F.3d 515, 518 (1st Cir. 2006).

**E.    The Need to Avoid Unwarranted Sentencing Disparities**

A Guidelines sentence in this case will not result in unwarranted sentencing disparities. In this case, the defendant chose to commit his crimes by using the names and identities of people who trusted and relied upon him – his co-workers, his clients, and even his parents.

The defendant's actions not only ruined Wave Software, a viable, functioning company, but likely irreparably harmed Revive You Media and changed the direction of those small business owners' lives. This is not a case were the defendant only caused harm on paper. Rather, as the letters from some of the victims make clear, this crime caused real, tangible harm to real people.

Despite defendant's representations to the contrary, this is not a case where the loss used to calculate the Guidelines range overstates the harm or the defendant's actual gain. Marsh is the person who personally gained and benefitted from nearly all of this fraud.  The Guidelines range, as set forth in the defendant's plea agreement, is directly tied and based on the actual loss and what the defendant personally did – the defendant was not a lower-level operative in a large conspiracy, a straw buyer, or a drug courier.  Rather, Marsh is the person who came up with the scheme and carried it out.  His clients, even if they benefited, were not the ones directing him to forge documents or approve them for loans that they did not qualify for.

Both this court and other judges within this district have imposed sentences close to or within the Advisory Guidelines range in similar fraud cases.  For example, in *United States v.*

*Gasser*, 17-CR-64-AJT, the defendant entered a pre-indictment plea to wire fraud for a multi-year scheme in which the defendant embezzled over $2.3 million dollars from his employer, a small fencing company, while serving in a position of trust as the company's chief financial officer and treasurer.  Dkt. 15.  The Guidelines range in *Gasser* was 51 to 63 months' imprisonment.  The Court imposed a Guidelines sentence of 63 months.  Dkt. 16.

In *United States v. Green-Morris*, 16-CR-190-CMH, the defendant Green-Morris entered a pre-indictment plea to conspiracy to a money laundering conspiracy for her role in defrauding and embezzling from her employer, a small business here in Virginia.  Over approximately four years, Green-Morris and her co-conspirator stole approximately $4.1 million from the company, which they used to live beyond their means.  Dkt. 36, 44.  The Guidelines range was 63 to 78 months' imprisonment.  The Court imposed a Guidelines sentence of 63 months, 3 years of supervised release, and ordered the defendant to pay $4.1 million in restitution.  Dkt. 46.

In *United States v. Ekobena et al.,* 15-CR-180, the defendants perpetrated several different fraud schemes, including a 6-year check fraud conspiracy that involved printing fraudulent checks in victims' names, then depositing the checks into bank accounts in other false names.  The main defendant also used an inside source to steal over $200,000 from Children's Hospital, and used stolen identities to purchase cars.  The conspiracy involved at least 9 co-conspirators.  Dkt. 126, 186.  The actual loss from the three schemes was slightly more than $710,000; the intended loss was approximately $1.25 million.  The Advisory Guidelines range was 97 to 121 months' imprisonment.  The Court sentenced Ekobena to 104 months' imprisonment.  Dkt. 135.

## IV.    CONCLUSION

For the foregoing reasons, the United States recommends that the court sentence the defendant to 84 months on Counts 1 (bank fraud) and 3 (wire fraud), to run consecutive with the mandatory 24 months on Count 2 (aggravated identity theft), 3 years of supervised release, order restitution, and enter the consent forfeiture order, which includes a money judgment of $8.6 million.


Respectfully submitted,

DANA J. BOENTE
United States Attorney


By:     _____/s/_____
        Katherine Wong
        Assistant United States Attorney
        Eastern District of Virginia

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 15, 2017, I will file the foregoing pleading with the Clerk of the Court, who will then send a notification of such filing (NEF) to counsel of record.

By: _____/s/_____

Katherine Wong
Assistant United States Attorney